[No. S097445. Nov. 27, 2002.]

RICHARD W. KATZBERG, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSTIY OF CALIFORNIA et al.,
Defendants and Respondents.

## COUNSEL

Siegel & Yee and Dan Siegel for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, Paul D. Fogel, Raymond A. Cardozo; Pahl & Gosselin, Kenneth L. Kann, Nanette Joslyn; James E. Holst, John F. Lundberg and Jeffrey A. Blair for Defendants and Respondents.

## OPINION

**GEORGE, C. J.**—We granted review in this matter and in the companion case, *Degrassi v. Cook* (2002) 29 Cal.4th 333 [127 Cal.Rptr.2d 508, 58 P.3d 360] (*Degrassi*), to consider whether an individual may bring an action for money damages on the basis of an alleged violation of a provision of the California Constitution, in the absence of a statutory provision or an established common law tort authorizing such a damage remedy for the constitutional violation. In the present case, plaintiff seeks, among other relief, monetary damages based upon defendant's alleged violation of his due process "liberty" interest under article I, section 7, subdivision (a), of the California Constitution (hereafter article I, section 7(a)), by failing to provide him with a timely "name-clearing" hearing after his removal as department chairman at a university medical center. We conclude that an action for damages is not available.[1]

---

[1] We do not here consider the propriety of actions such as those based upon grounds established under common law tort principles—for example, actions for false arrest, false imprisonment, wrongful termination based upon violation of public policy, or the like. In such actions, a breach of duty or violation of public policy may be established by demonstrating a

## I.

In 1991, plaintiff Richard W. Katzberg was appointed professor of medicine at the University of California at Davis Medical School and Chairperson of the Department of Radiology at the University of California Davis Medical Center. In July 1995, the university commenced an investigation concerning alleged mishandling of funds by the department of radiology. In February 1996, the university issued a press release regarding the investigation, and the Sacramento District Attorney's Office thereafter announced that it would initiate a criminal investigation.

The investigation concerned approximately $250,000 that allegedly had been placed inappropriately in radiology accounts to be used for payment of department expenses. Most of this money came from rebates provided by medical equipment vendors. There never has been any allegation that plaintiff made any personal use of the challenged funds. Instead, the alleged improprieties related to placement of funds in the department's account rather than in the medical center's general funds.

In March 1996, the university announced that "appropriate personnel actions" had been initiated, but did not name any specific employee. Later that month, plaintiff was removed as chairperson of the department. He remained a tenured professor at the medical school and a staff physician at the medical center.

In February 1997, plaintiff sued various defendants on numerous grounds, and the resulting litigation has moved back and forth between state and federal courts.[2] For present purposes, it is sufficient to note that plaintiff's third amended complaint—the one here at issue—named as defendants the Regents of the University of California (the Regents) and the Chancellor of the University of California at Davis, Larry N. Vanderhoef (hereafter collectively, defendants). The complaint alleged that by making stigmatizing statements about plaintiff in the course of removing him from his position as department chairperson, defendants violated the *liberty* interest of plaintiff protected under article I, section 7(a).

Although the department chairmanship was an at-will position, terminable without cause at the discretion of the chancellor of the Davis

violation of a constitutional provision, and damages properly may be awarded to remedy the tort. We consider here only whether an action for damages is available to remedy a constitutional violation that is not tied to an established common law or statutory action.

[2]Defendants filed an unopposed motion for judicial notice, submitting for our consideration various filings in the earlier related litigation in this case. We granted the motion in an order filed prior to oral argument.

campus (and hence plaintiff concedes that he had no due process *property* right to that position), it is well established that "an at-will [public] employee's *liberty* interests are deprived when his discharge is accompanied by charges 'that might seriously damage his standing and associations in his community' or 'impose[] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.'" (*Holmes v. Hallinan* (1998) 68 Cal.App.4th 1523, 1530 [81 Cal.Rptr.2d 174], quoting *Board of Regents v. Roth* (1972) 408 U.S. 564, 573 [92 S.Ct. 2701, 2709-2710, 33 L.Ed.2d 548] (*Roth*).) When such a liberty deprivation occurs, a party has a right to a "name-clearing hearing." (*Codd v. Velger* (1977) 429 U.S. 624, 627 [97 S.Ct. 882, 883-884, 51 L.Ed.2d 92].)

The third amended complaint alleged that plaintiff had not been provided with such a hearing at which he could defend himself, either prior to, or since, his removal. The complaint also sought a variety of relief, including an injunction, damages, attorney fees, and costs.

The trial court granted defendants' motion to strike the prayer for relief. Later, in October 1999—three and a half years after plaintiff's removal—defendants offered plaintiff a name-clearing hearing. For the next few months, the parties negotiated unsuccessfully concerning the parameters of such a hearing. In February 2000, defendants revised and renewed the proposal for a name-clearing hearing, but plaintiff rejected that offer, and no such hearing has been held.

Defendants thereafter moved for summary judgment on plaintiff's due-process-liberty-interest claim on the grounds that (i) a liberty interest violation could not be proved, because the "alleged false statements are not stigmatizing as a matter of law," and (ii) even if a liberty interest violation could be proved, the remedy would be limited to a name-clearing hearing, which plaintiff previously had rejected. Plaintiff opposed the motion on the ground, among others, that defendants had not offered him an adequate name-clearing hearing.

In April 2000, following a court hearing, the trial judge granted summary judgment to defendants, finding they had offered plaintiff an adequate name-clearing hearing, and that such a postremoval hearing was the sole remedy for the asserted liberty interest violation under the due process clause of article I, section 7(a). The court found that money damages were not available under California law to remedy "infringement of liberty interests," or to remedy any alleged undue delay in the offer of a name-clearing hearing. The trial court confined its ruling on the summary judgment motion to the damages issue, and did not rule on defendants' claim that plaintiff's allegations were insufficient to demonstrate a liberty-interest violation.

Upon review, the Court of Appeal began by noting that the state constitutional due process liberty interest alleged to have been violated in this case has been recognized under the due process clause of the Fourteenth Amendment of the federal Constitution in *Roth, supra,* 408 U.S. 564, 573 [92 S.Ct. 2701, 2707]. In that decision the high court observed that " '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' [Citations.] In such a case, due process would accord an opportunity to refute the charge before University officials." (*Ibid.*)[3] The Court of Appeal stated that it would assume for purposes of analysis that a similar liberty interest exists under article I, section 7(a) of the state Constitution, and it further assumed that the facts alleged in this case state a violation of plaintiff's due process liberty interest under this provision of the state Constitution. Focusing solely upon the damages question, the Court of Appeal affirmed the trial court's grant of summary judgment for defendants, holding that money damages are not available to remedy such a violation of the liberty interest under article I, section 7(a).

In this court, plaintiff contends that article I, section 7(a) affords him a right to damages for the asserted violation of his due process liberty interest. By contrast, defendants assert that a name-clearing hearing is the sole remedy that a court should impose for the alleged constitutional violation. For purposes of analyzing the damages issue upon which we granted review, we shall assume, as did the Court of Appeal, that the facts alleged in the third amended complaint are sufficient to establish a violation of the due process liberty interest under the state Constitution's due process clause.

## II.

█ Article I, section 26 of the California Constitution states: "The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." Under this provision, "all branches of government are required to comply with constitutional directives (*Mosk v. Superior Court* (1979) 25 Cal.3d 474, 493, fn. 17 [159 Cal.Rptr. 494, 601 P.2d 1030]; *Bauer-Schweitzer Malting Co. v. City and County of San Francisco* (1973) 8 Cal.3d 942, 946 [106 Cal.Rptr. 643, 506 P.2d 1019]) or prohibitions (*Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 8 [95 Cal.Rptr. 329,

---

[3]See also *Codd v. Velger, supra,* 429 U.S. 624, 627 [97 S.Ct. 882, 883-884] (when there has been a due process liberty violation, the "remedy mandated . . . [for an employee] is 'an opportunity to refute the charge' . . . [and] 'to clear his name' "); *Binkley v. City of Long Beach* (1993) 16 Cal.App.4th 1795, 1807-1808 [20 Cal.Rptr.2d 903] (a liberty interest is implicated by removal from a public position for mismanagement, and due process requires that the person removed have an opportunity to refute the charges and clear his or her name); *Holmes v. Hallinan, supra,* 68 Cal.App.4th 1523, 1530-1531.

485 P.2d 529, 46 A.L.R.3d 351]).” *(Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1454 [249 Cal.Rptr. 688] *(Leger)*.) As we observed more than a century ago, “[e]very constitutional provision is self-executing to this extent, that everything done in violation of it is void.” *(Oakland Paving Co. v. Hilton* (1886) 69 Cal. 479, 484 [11 P. 3].)

Accordingly, the question posed in this case is not whether article I, section 7(a) is “self-executing.” It is clear that the due process clause of article I, section 7(a) *is* self-executing, and that even without any effectuating legislation, all branches of government are required to comply with its terms. Furthermore, it also is clear that, like many other constitutional provisions, this section supports an action, brought by a private plaintiff against a proper defendant, for declaratory relief or for injunction. (See generally *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774]; Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses (2d ed. 1996) § 7-5(a), pp. 416-418 (Friesen).) ▮ The question presented here is whether, assuming the complaint states a violation of plaintiff’s due process liberty interest, plaintiff may maintain an action for *monetary damages* to remedy the asserted violation of his due process liberty interests under article I, section 7(a), on the facts alleged.[4]

### III.

▮ More than 30 years ago in *Bivens v. Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388 [91 S.Ct. 1999, 29 L.Ed.2d 619] *(Bivens)*, the United States Supreme Court recognized the right of a party to recover damages for the violation of a constitutional right in an action against federal agents. In *Bivens*, a citizen’s Fourth Amendment right against unreasonable search and seizure was violated by federal law enforcement officers. The court in *Bivens* did not approach the issue as posing a question whether the

[4] As observed in Friesen, *supra*, section 7-5, at page 416: “Occasionally the argument over damages is cast in terms of whether the clause is ‘self-executing.’ However, [the self-executing issue] truly concerns the question whether a clause is *judicially* enforceable at all, and does not automatically answer the question whether damages are available for enforceable clauses.” Some cases, recognizing this, have characterized the inquiry concerning whether a damages remedy is allowed as presenting a question whether the provision under review is “ ‘*self-executing’ in a different sense*”—and as calling for examination as to whether the provision “provides [for] rules or procedures by which its declaration of rights is to be enforced, and, in particular, whether it provides citizens with a specific *remedy* by way of damages for its violation in the absence of legislation granting such a remedy.” *(Leger, supra,* 202 Cal.App.3d at p. 1454, first italics added.) As explained *post*, part IV.A.2., we agree that these considerations are relevant in determining the availability of a damages remedy, but we believe it potentially confusing to employ the “self-executing” terminology in this context; accordingly, we shall not do so.

Fourth Amendment was *intended* to provide an action for damages, or whether such an intent could be *inferred* from that provision; instead, the court viewed the matter as posing a question whether the court should create a cause of action for damages—in effect, a constitutional tort—to remedy a Fourth Amendment violation, even though Congress had not specifically provided such a remedy and even though the Fourth Amendment does not provide for enforcement by an award of damages. (*Id.*, at pp. 395-397 [91 S.Ct. at pp. 2004-2005]; see also *id.*, at pp. 398-411 [91 S.Ct at pp. 2005-2012] (conc. opn. by Harlan, J.).)[5] The high court reasoned that as a general proposition " 'federal courts may use any available remedy to make good the wrong done.' " (*Id.*, at p. 396 [91 S.Ct. at p. 2004].) In support of its conclusion that a damages remedy was warranted, the court emphasized that (i) there existed "no special factors counseling hesitation" to recognize such a right (*ibid.*); (ii) there was no equally effective alternative remedy (*id.*, at p. 397 [91 S.Ct. at p. 2005]; see also *id.*, at p. 410 [91 S.Ct. at pp. 2011-2012] (conc. opn. of Harlan, J.)); and (iii) there was no "explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents" (*id.*, at p. 397 [91 S.Ct. at p. 2005]).[6]

Subsequent to *Bivens*, the United States Supreme Court has considered numerous cases in which plaintiffs have sought money damages under a constitutional cause of action premised upon the asserted violation of various federal constitutional provisions. After twice following the lead of *Bivens*, and recognizing the availability of a constitutional tort action for damages on the strength of the considerations set out above (*Davis v. Passman* (1979) 442 U.S. 228, 245 [99 S.Ct. 2264, 2277, 60 L.Ed.2d 846] (*Davis*) [damages allowed to remedy violation by former congressman of equal protection component of Fifth Amendment due process clause]; *Carlson v. Green* (1980) 446 U.S. 14, 18-23 [100 S.Ct. 1468, 1471-1474, 64 L.Ed.2d 15] (*Carlson*) [damages allowed to remedy Eighth Amendment violations by prison officials]), the high court for the past two decades repeatedly has refused to recognize a federal constitutional tort action for money damages in cases presenting that issue. (*Chappell v. Wallace* (1983) 462 U.S. 296, 305

---

[5]The court asserted: "The question is merely whether petitioner, if he can demonstrate injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in federal courts. [Citations.] 'The very essence of civil liberty certainly consists of the right of every individual to claim the protection of the laws, whenever he receives an injury.' *Marbury v. Madison*, 1 Cranch 137, 163 [2 L.Ed. 60] (1803)." (*Bivens, supra*, 403 U.S. 388, 397 [91 S.Ct. 1999, 2005].)

[6]In so holding, *Bivens, supra*, 403 U.S. 388, allowed suits against federal agents comparable to the suits that Congress expressly permitted against state agents through the enactment of 42 United States Code section 1983.

[103 S.Ct. 2362, 2368, 76 L.Ed.2d 586] (*Chappell*) [alleged equal protection violations by superior officer in United States military]; *Bush v. Lucas* (1983) 462 U.S. 367 [103 S.Ct. 2404, 76 L.Ed.2d 648] (*Bush*) [alleged First Amendment violation against federal agency employee by superiors]; *United States v. Stanley* (1987) 483 U.S. 669 [107 S.Ct. 3054, 97 L.Ed.2d 550] [alleged due process violations by military personnel during the course of active military service]; *Schweiker v. Chilicky* (1988) 487 U.S. 412 [108 S.Ct. 2460, 101 L.Ed.2d 370] (*Schweiker*) [alleged due process violation by government officials, resulting in deprivation of Social Security benefits]; *FDIC v. Meyer* (1994) 510 U.S. 471 [114 S.Ct. 996, 127 L.Ed.2d 308] (*Meyer*) [alleged due process violation concerning employment termination by federal agency]; *Correctional Services Corp. v. Malesko* (2001) 534 U.S. 61, 68 [122 S.Ct. 515, 520, 151 L.Ed.2d 456] (*Malesko*) [alleged Eighth Amendment violation by private operator of federal prison halfway house].)

In each of these more recent cases, the high court found that the first *Bivens* consideration mentioned above—"special factors" that "counsel hesitation" by a court in recognizing a constitutional tort damages remedy—militated against recognition of that remedy. (*Bivens, supra*, 403 U.S. 388, 396.) And in these recent cases, the court also substantially retreated from, and reformulated, the other *Bivens* considerations mentioned above. The court has found that the absence of a "complete" alternative remedy will not support an action for damages, so long as a "meaningful" alternative remedy in state or federal law is available (*Bush, supra*, 462 U.S. at p. 386 [103 S.Ct. at pp. 2415-2416]; *Schweiker, supra*, 478 U.S. at pp. 422-425 [108 S.Ct. at pp. 2467-2469]), and it has implicitly discarded the proposition, mentioned in *Bivens, supra*, 403 U.S. at pp. 396-397 [91 S.Ct. 1999, 2004-2005], and emphasized in *Davis, supra*, 442 U.S. 228, 246-247 [99 S.Ct. 2264, 2277-2278], and *Carlson, supra*, 446 U.S. 14, 19-20 [100 S.Ct. 1468, 1471-1472], that money damages are *presumptively* available unless Congress prohibits that remedy (e.g., *Chappell, supra*, 462 U.S. at p. 304 [103 S.Ct. at pp. 2367-2368]; *Bush, supra*, 462 U.S. at pp. 380-390 [103 S.Ct. at pp. 2412-2418]; *Schweiker, supra*, 478 U.S. at p. 429 [108 S.Ct. at pp. 2367-2368]; *Meyer, supra*, 510 U.S. at p. 486 [114 S.Ct. at pp. 1005-1006]).[7]

---

[7]Although the high court has declined to extend *Bivens*, it has not abandoned the core holding of that case, and has recognized the continuing validity of that decision and its progeny. (See *McCarthy v. Madigan* (1992) 503 U.S. 140, 144-156 [112 S.Ct. 1081, 1085-1092, 117 L.Ed.2d 291] [plaintiff, federal prisoner, not required to exhaust administrative remedies prior to pursuing an Eighth Amendment action under *Bivens*]; *Malesko, supra*, 534 U.S. 61, 71-72 [122 S.Ct. 515, 522] [holding that a *Bivens* claim may not be asserted against an agency, but noting that such a claim may be asserted against an individual officer].)

The experience in other jurisdictions has been similar. Some out-of-state decisions, often relying upon a combination of (i) the jurisdiction's indigenous common law antecedents, (ii) special legislative history, and (iii) the Restatement Second of Torts, section 874A,[8] have recognized a constitutional tort cause of action and corresponding right to be awarded money damages for various state constitutional violations.[9] A greater number of cases, however, often tracking the reasoning of the most recent United States Supreme Court decisions or pointing to the absence of any historical basis for implying a damages action, have declined to recognize such a constitutional tort or implied damages remedy in a variety of circumstances.[10]

---

[8]See *post*, part IV.B. (quoting and discussing the Restatement provision).

[9]See *Brown v. State of New York* (1996) 89 N.Y.2d 172, 188-192 [652 N.Y.S.2d 223, 674 N.E.2d 1129, 1138-1141, 75 A.L.R.5th 769] (*Brown*) (damages allowed for violation of state's search and seizure and equal protection provisions, based upon Restatement Second of Torts, section 874A, early New York case authority recognizing a right to damages for such violations, and the absence of adequate alternative remedies); *Widgeon v. Eastern Shore Hosp. Center* (1984) 300 Md. 520 [479 A.2d 921, 923-925] (*Widgeon*) (damages allowed for violation of state's search and seizure provision, based in part upon well-established English and early Maryland common law antecedents); *Moresi v. Dept. of Wildlife & Fisheries* (La. 1990) 567 So.2d 1081, 1091-1093 (*Moresi*) (damages permissible to remedy illegal search and seizure, based in part upon English common law); see also *Binette v. Sabo* (1998) 244 Conn. 23 [710 A.2d 688, 699] (damages allowed for state constitution search and seizure violation; court found this remedy supported by "compelling policy considerations" and the absence of any special factors counseling against recognition of such an action); *Corum v. University of North Carolina* (1992) 330 N.C. 761 [413 S.E.2d 276, 289-291] (suggesting that damages may be allowed to remedy state free speech violation, based upon state common law authority, but noting that courts must defer to alternative remedies); *Old Tuckaway v. City of Greenfield* (1993) 180 Wis.2d 254 [509 N.W.2d 323, 328, fn. 4] (suggesting in dictum that damages may be allowed to remedy violations of state due process clause); see also *Walinski v. Morrison & Morrison* (1978) 60 Ill.App.3d 616 [18 Ill.Dec. 89, 377 N.E.2d 242, 243-245] (*Walinski*) (damages allowed to remedy violation of constitutional antidiscrimination clause; court found the drafters of the provision intended to create a right enforceable through damages).

Other decisions upon which plaintiff relies do not hold money damages to be available. *Phillips v. Youth Development Program* (1983) 390 Mass. 652 [459 N.E.2d 453], merely recognizes that jurisdictions differ on this issue, and does not otherwise address the question. (See *id.*, at p. 457, fn. 4.) Likewise, the earlier case of *Cooper v. Nutley Sun Printing Co.* (1961) 36 N.J. 1891 [75 A.2d 639] stressed that courts possess broad equitable powers to remedy such violations, but did not specifically endorse the award of money damages. (*Id.*, at pp. 644-645.)

[10]See *Dick Fischer Dev. v. Dept. of Admin.* (Alaska 1992) 838 P.2d 263, 268 (*Dick Fischer*) (no damages allowed for asserted violation of state due process provision, based in part upon availability of alternative remedies); *Board of County Com'rs v. Sundheim* (Colo. 1996) 926 P.2d 545, 549-553 (*Sundheim*) (no damages allowed for asserted violation of state due process provision, based in part upon availability of alternative remedies); *Kelley Property Dev. v. Town of Lebanon* (1993) 226 Conn. 314 [627 A.2d 909, 923-924] (*Kelley*) (no damages allowed for asserted violation of state due process provision, based in part upon availability of alternative remedies and special factors counseling hesitation to recognize such a right); *Garcia v. Reyes* (Fla.Dist.Ct.App. 1997) 697 So.2d 549, 551 (summarily holding there is no

California decisions have followed a similar trend. Putting aside cases recognizing an inverse condemnation action for damages to remedy a violation of the state just compensation clause (a constitutional provision that clearly contemplates an award of damages determined in a judicial proceeding, see Cal. Const., art. I, § 19),[11] only two decisions, each filed two decades ago, have recognized an action for damages to remedy a violation of the state Constitution. All subsequent decisions addressing the issue have declined to find such an action for damages. We proceed to review, in chronological order, the relevant California cases.

In *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592] (*Gay Law Students*), this court addressed an

right to money damages for violation of state due process guarantee); *77th Dist. Judge v. State* (1989) 175 Mich.App. 681 [438 N.W.2d 333, 339-340] (*77th Dist. Judge*) (no damages for violation of state equal protection rights; court noted, among other things, the availability of alternative relief and deference to legislative policymaking expertise); *Moody v. Hicks* (Mo.Ct.App. 1997) 956 S.W.2d 398, 402 (no damages for asserted violation of state search and seizure rights; court noted, among other things, the availability of alternative relief and deference to legislative policymaking expertise); *Rockhouse Mountain Prop. v. Town of Conway* (1986) 127 N.H. 593 [503 A.2d 1385, 1388-1389] (*Rockhouse*) (no damages for alleged state due process and equal protection violations, based in part upon availability of alternative remedies); *Augat v. State* (1997) 244 A.D.2d 835, 836-837 [666 N.Y.S.2d 249, 251-252] (declining to extend *Brown, supra*, 89 N.Y.2d 172 [674 N.E.2d 1129], to allow damages for asserted violation of due process and freedom of association rights, based upon availability of alternative remedies); *Hanton v. Gilbert* (1997) 126 N.C.App. 561 [486 S.E.2d 432, 438-439] (no damages for alleged violation of state due process clause, based in part upon availability of alternative remedies and deference to legislature); *Provens v. Stark Cty. Bd. of Mental Ret.* (1992) 64 Ohio St.3d 252 [594 N.E.2d 959, 963-965] (*Provens*) (no damages for alleged state free speech violation, based in part upon availability of alternative remedies and deference to legislature); *Hunter v. City of Eugene* (1990) 309 Or. 298 [787 P.2d 881, 883-884] (no damages for alleged state "free expression" violations based in part upon absence of textual or historic basis for implying such a right; court concluded that creation of such a right is a task properly left to legislature); *City of Beaumont v. Bouillion* (Tex. 1995) 896 S.W.2d 143, 148-150 (no damages for alleged state free speech and assembly violations; court noted there was no evidence that violations of the provisions were intended to be remedied by damages, and observed that there was no historical or common law basis for recognizing a damages action); *Spackman ex rel. Spackman v. Board of Educ.* (Utah 2000) 16 P.3d 533, 537-539 (*Spackman*) (no damages for asserted state due process and "open education" violations, based in part upon availability of alternative remedies and deference to legislature); *Shields v. Gerhart* (1995) 163 Vt. 219 [658 A.2d 924, 929-934] (*Shields*) (no damages for asserted state free speech and due process violations, based in part upon availability of alternative remedies).

[11]See *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 362-367 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *Holtz v. Superior Court* (1970) 3 Cal.3d 296, 302 [90 Cal.Rptr. 345, 475 P.2d 441] (applying Cal. Const., former art. I, § 14); *Rose v. State of California* (1942) 19 Cal.2d 713, 720 [123 P.2d 505] (same, noting the provision is "self-executing" and supports an action for damages, even in the absence of statutory authorization); *Weber v. County of Santa Clara* (1881) 59 Cal. 265, 266 (same); see generally *Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 519-524 [38 Cal.Rptr.2d 489] (setting out relevant history of the just compensation clause and contrasting it with relevant history of the equal protection clause).

action by employees who claimed they were discriminated against by their employer, a state-regulated telephone company, on the basis of their sexual orientation. Our opinion observed that the plaintiffs sought declaratory and injunctive relief, and "also prayed for monetary damages." (*Id.*, at p. 464.) Without expressly addressing the question of availability of damages in addition to the requested equitable relief, we held that the plaintiffs could maintain a "direct court action" under the California equal protection clause, article I, section 7(a).[12] (*Gay Law Students, supra.*, at p. 475 & fn. 10.) In the process of announcing this holding we added a "cf." signal and citation to *Bivens, supra*, 403 U.S. 388, 390-397 [91 S.Ct. 1999, 2001-2005]. (*Gay Law Students, supra*, at p. 475.)

Plaintiff suggests that our citation in *Gay Law Students, supra*, 24 Cal.3d 458, to those pages of *Bivens* implies approval of a damages remedy for the equal protection violation asserted in *Gay Law Students*. Only the last few of the pages cited from *Bivens* spoke to the question of damages, however, and given the circumstance that in *Gay Law Students*, we did not explicitly address the question of damages, it would be an overstatement to interpret that decision, or its citation to *Bivens*, as directly endorsing such a remedy.

Plaintiff does, however, find support for his position in the Court of Appeal opinion in *Laguna Publishing Co. v. Golden Rain Foundation* (1982) 131 Cal.App.3d 816 [182 Cal.Rptr. 813] (*Laguna Publishing*). In that case the Court of Appeal, in a two-to-one decision, held that the owners of a private gated retirement community violated a newspaper publisher's state free speech and press rights (Cal. Const., art. I, § 2, subd. (a)) by enforcing a rule barring the distribution of unsolicited free newspapers within the community, and the court remanded the case for a new trial at which the plaintiff would have an opportunity to prove damages. (*Laguna Publishing*, at pp. 848-857.) In reaching this conclusion and expressly finding that money damages were available, the majority stressed the "*special dignity*" of "the rights of free speech and free press" (*id.*, at p. 853, italics in original), thereby suggesting that violation of such rights may be remedied by equitable relief and/or damages but that violation of other constitutional rights of "lesser" dignity may not warrant relief in damages. The majority did not consider whether article I, section 2, subdivision (a) was *intended* to afford a damages remedy, and, instead, appears to have found a right to damages based upon a constitutional tort theory similar to that employed in *Bivens* and its progeny.

Shortly after *Laguna Publishing* was filed, the Court of Appeal in *Fenton v. Groveland Community Services Dist.* (1982) 135 Cal.App.3d 797 [185

---

[12]In addition to setting out the due process liberty right at issue in this case, article I, section 7(a) also provides, "A person may not be . . . denied equal protection of the laws . . . ."

Cal.Rptr. 758] (*Fenton*) considered a suit in which it was claimed that various county officials denied the plaintiffs their right to vote in a general election. The plaintiffs filed an action for damages to remedy the asserted violation of voting rights under California Constitution, article II, section 2. In the process of addressing various claims of immunity, and without focusing upon the propriety of damages as a remedy for the asserted violation, the court impliedly endorsed, in passing, the notion that there exists a right to seek damages to remedy a violation of the state constitutional right to vote. As in *Laguna Publishing, supra,* 131 Cal.App.3d 816, the court in *Fenton* did not consider whether our Constitution's right-to-vote provision was *intended* to afford such a remedy; instead, it simply relied upon *Laguna Publishing* and the asserted "special dignity" of the right to vote (*Fenton,* at p. 805), and upon inverse condemnation case law. (*Ibid.*)[13]

---

[13]Five other decisions relied upon by plaintiff are distinguishable. We held in *White v. Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222], that California Constitution article I, section 1, was "intended to be self-executing, i.e., that the constitutional provision, in itself, 'creates a legal and enforceable right of privacy for every Californian,' " and hence supported an action for an injunction. But we did not consider or address any claim for damages. In *Payton v. City of Santa Clara* (1982) 132 Cal.App.3d 152 [183 Cal.Rptr. 17], the Court of Appeal reversed a judgment of dismissal that was entered following the granting of a summary judgment motion in an action for violation of privacy rights under California Constitution, article I, section 1. The claimed violation arose from an employer's act of posting a notice of the plaintiff's termination and the reasons therefor in a public workroom. Although noting that the plaintiff had prayed for damages (*Payton,* at p. 154), the court did not address the availability of such damages, but held only that the complaint stated a prima facie violation of the right of privacy. *Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825 [134 Cal.Rptr. 839] (*Porten*) is similarly distinguishable. There the plaintiff sued for damages under the state constitutional right of privacy, claiming that the university improperly disclosed the grades he had earned at an out-of-state school. The Court of Appeal concluded that the action could be brought, despite the absence of enabling legislation. In the process of reaching this conclusion, the court appears to have assumed that damages would be available for such a violation, but it did not analyze or discuss that question. In any event, each of the foregoing decisions was rendered under the privacy provision of article I, section 1—a provision with a relatively rich legislative history—and is not directly on point here. We have no occasion to consider in the present case the circumstances under which the privacy clause of the state Constitution may support a cause of action for damages.

Two decisions cited by plaintiff—*Wilkerson v. City of Placentia* (1981) 118 Cal.App.3d 435 [173 Cal.Rptr. 294] and *Lubey v. City and County of San Francisco* (1979) 98 Cal.App.3d 340 [159 Cal.Rptr. 440]—are closer on point, because they involve due process claims arising in the employment context, but they too are distinguishable from the case before us. Those decisions approved an action for reinstatement with backpay, following a due process violation in the termination of probationary employees for misconduct. As defendants observe, however, the facts in both cases suggest that the plaintiffs possessed a due process *property* interest as well as a due process liberty interest. In the present case, plaintiff concedes he had no due process property interest in his position. Moreover, neither *Wilkerson* nor *Lubey* explicitly analyzed the question whether damages are available in an action based directly and solely upon the due process provisions of article I, section 7(a), or any other constitutional provision.

Most subsequent California cases that have addressed the availability of damages—all decided by the Court of Appeal—have taken an approach different from the "constitutional tort" analysis of *Bivens* and its progeny. Whereas *Bivens* and many of the federal and state decisions that have applied its principles have focused upon the circumstances in which a court *should create* or *recognize* a tort action premised upon violation of a constitutional provision, most California decisions issued during the past two decades, by contrast, have viewed the determinative question as whether an action for damages exists in (or can be inferred from) the constitutional provision at issue. Accordingly, most of the recent California decisions expressly focus their analysis upon whether the provision at issue was *intended,* either expressly or impliedly, to afford relief in damages.

In *Leger, supra,* 202 Cal.App.3d 1448, a high school student who was assaulted in a restroom sued the school district for damages under the "safe schools" clause of California Constitution, article I, section 28, subdivision (c) (article I, section 28(c)).[14] The Court of Appeal reviewed the history of that provision, which was added to the Constitution as part of a broad criminal justice initiative in 1982, and found "no indication . . . to suggest it was intended to support an action for damages in the absence of enabling and defining legislation." (*Leger,* at p. 1456.) The court also observed that the plaintiff had not advanced a constitutional tort theory of recovery, and declined to address such a theory. (*Id.,* at p. 1457, fn. 4.) The court held that the plaintiff could not maintain an action for damages.

In *Clausing v. San Francisco Unified School District* (1991) 221 Cal.App.3d 1224 [271 Cal.Rptr. 72] (*Clausing*), the Court of Appeal considered an action for damages to remedy asserted violations of both the "safe schools" clause (art. I, § 28(c)) and the privacy clause (art. I, § 1) of the California Constitution, based upon a school district's alleged physical and emotional mistreatment of a handicapped student. On the first point, the court agreed with *Leger, supra,* 202 Cal.App.3d 1448, finding "nothing in the legislative history of section 28, subdivision (c), to suggest that it was intended to create a civil action for damages." (*Clausing, supra,* 221 Cal.App.3d at p. 1237.)[15] On the second point, the court summarily concluded that the privacy provision affords only a right to injunctive relief and

---

[14]Article I, section 28(c) states in full: "Right to safe schools. All students and staff of public primary, elementary, junior high and senior high schools have the inalienable right to attend campuses which are safe, secure and peaceful."

[15]The court stated: "The right proclaimed by [the constitutional provision], although inalienable and mandatory, simply establishes the parameters of the principle enunciated; the specific means by which it is to be achieved for the people of California are left to the Legislature." (*Clausing, supra,* 221 Cal.App.3d at p. 1237.) The court further observed in a footnote: "In this respect section 28, subdivision (c), is closely analogous to article I, section

does not afford a right to damages. (*Id.*, at p. 1238.)[16] Accordingly, the court declined to allow either action for damages.

The plaintiffs in *Gates v. Superior Court, supra,* 32 Cal.App.4th 481 (*Gates*) sought damages to remedy an asserted violation of their rights under the state equal protection clause (Cal. Const., art. I, § 7), based upon the allegedly discriminatory deployment of police protection during a riot. The court found that neither the language of the provision, nor the court's extensive review of the historical documents underlying the provision, revealed any intent to afford a damages remedy (32 Cal.App.4th at pp. 519-524), and declined to allow such an action.[17]

In *Bonner v. City of Santa Ana* (1996) 45 Cal.App.4th 1465 [53 Cal.Rptr.2d 671] (*Bonner*), a homeless man stored his bag of possessions under a bush near the Santa Ana City Hall. City employees found the bag and discarded it. The plaintiff sued for damages, asserting violations of his due process right to property and of his equal protection rights. (Art. I, § 7(a).) Relying upon *Gates, supra,* 32 Cal.App.4th 481, the court found no intent by the electorate to provide a damages remedy for violations of the state equal protection clause, and declined to allow such an action. (*Bonner, supra,* 45 Cal.App.4th at p. 1473.)

The court in *Bonner* also undertook an analysis of the voters' intent with regard to affording a damages action to remedy the asserted due process clause violation. (*Bonner, supra,* 45 Cal.App.4th 1465, 1473-1476.) The court concluded from its review of *Bivens, supra,* 403 U.S. 388, and its progeny—notably, *Davis, supra,* 442 U.S. 228—that the due process clause

1, of the California Constitution, which states: 'All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.' Clearly, although safety and happiness are inalienable rights, this provision of the Constitution does not establish the means whereby they may be enjoyed. No case ever has held that this provision enunciating the inalienable right to obtain safety and happiness is self-executing in the sense that it gives rise, in and of itself, to a private right of action for damages or an affirmative duty on the part of the state to take particular steps to guarantee the enjoyment of safety or happiness by all citizens. (*Langdon* v. *Sayre* (1946) 74 Cal.App.2d 41, 44 [168 P.2d 57] . . . .)" (*Id.* at p. 1237, fn. 6.)

[16]In so concluding, the court relied upon *White v. Davis, supra,* 13 Cal.3d 757, in which we held that the privacy clause of article I, section 1, supported an action for injunction, but the court in *Clausing* overlooked *Porten, supra,* 64 Cal.App.3d 825, in which, as observed *ante,* footnote 13, the court suggested that money damages are available in an action based upon a violation of that same clause.

[17]The court in *Gates* criticized the decisions in *Laguna Publishing, supra,* 131 Cal.App.3d 816, and *Fenton, supra,* 135 Cal.App.3d 797, for failing to discuss whether the provisions at issue were intended to support an action for damages. (*Gates, supra,* 32 Cal.App.4th at p. 525, fn. 16.)

of the federal Constitution supports an action for damages, in the absence of an alternative or equally effective remedy. The court in *Bonner* hypothesized that the voters' intent in enacting the due process right set out in article I, section 7(a), was to mirror the due process right recognized in its federal counterpart, and accordingly the court in *Bonner* reasoned that in the absence of an alternative or equally effective remedy, the state due process clause similarly provided a right to damages. The court in *Bonner* ultimately concluded that damages were not available, however, on the ground that the plaintiff had an effective alternative remedy—a common law action for conversion. (*Bonner, supra,* 45 Cal.App.4th at pp. 1473-1476.)

Thereafter the plaintiff in *Bradley v. Medical Board* (1997) 56 Cal.App.4th 445 [65 Cal.Rptr.2d 483] (*Bradley*) asserted a due process violation under article I, section 7(a), relating to his surrender of a medical license while disciplinary charges were pending against him. He sought damages for the alleged violation. Relying upon *Bonner, supra,* 45 Cal.App.4th 1465, and *Gates, supra,* 32 Cal.App.4th 481, the court in *Bradley* summarily and categorically concluded: "There is . . . no right to sue for monetary damages under this constitutional provision." (*Bradley, supra,* 56 Cal.App.4th at pp. 462-463.)

Apart from the present case and the companion matter, *Degrassi,* the most recent Court of Appeal decision addressing the general issue of money damages to remedy a state constitutional violation is *Carlsbad Aquafarm, Inc. v. State Dept. of Health Services* (2000) 83 Cal.App.4th 809 [100 Cal.Rptr.2d 87] (*Carlsbad Aquafarm*). In that case, a shellfish producer sued a state agency for damages allegedly resulting from the agency's refusal to process a form that was required to permit the producer to sell its products outside California, a refusal that the producer claimed violated its procedural due process rights under article I, section 7(a). The court in *Carlsbad Aquafarm* held that no such action for damages could be maintained.

The court began by taking note of *Bivens, supra,* 403 U.S. 388, and most of the subsequent United States Supreme Court and California decisions discussed above. (*Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809, 816.) Having discerned "no single rationale underlying [those] decisions" (*ibid.*), the court proposed an analysis that essentially combines (i) some of the policy-based factors that have been considered in the "constitutional tort" cases, and (ii) the intent-based analysis adopted by recent California Court of Appeal decisions: "On reviewing these decisions, we believe the issue of whether to recognize a state constitutional tort is essentially one of policy and is dependent on numerous factors, including (1) the voters' intent in permitting monetary damages for a violation of the particular constitutional

provision[;] (2) the availability of another remedy; (3) the extent to which the provision is 'self-executing' and the judicial manageability of the tort; and (4) the importance of the constitutional right." (*Id.*, at p. 817.) After "[a]pplying appropriate weight to each of these factors" (*ibid.*), the court concluded that the plaintiff was not entitled to recover damages for the state's alleged violation of its procedural due process rights.

## IV.

■■■ As we shall explain, we conclude it is appropriate to employ the following framework for determining the existence of a damages action to remedy an asserted constitutional violation. First, we shall inquire whether there is evidence from which we may find or infer, within the constitutional provision at issue, an affirmative intent either to authorize or to withhold a damages action to remedy a violation. In undertaking this inquiry we shall consider the language and history of the constitutional provision at issue, including whether it contains guidelines, mechanisms, or procedures implying a monetary remedy, as well as any pertinent common law history. If we find any such intent, we shall give it effect.

Second, if no affirmative intent either to authorize or to withhold a damages remedy is found, we shall undertake the "constitutional tort" analysis adopted by *Bivens* and its progeny. Among the relevant factors in this analysis are whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision. If we find that these factors militate against recognizing the constitutional tort, our inquiry ends. If, however, we find that these factors favor recognizing a constitutional tort, we also shall consider the existence of any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages.

## A.

■■■ We begin our inquiry by asking whether, when the constitutional provision at issue was adopted, the enactors *intended* that it include a damages remedy for its violation. (*Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809, 817; *Gates, supra,* 32 Cal.App.4th 481, 517-518, and cases cited; see generally *White v. Davis, supra,* 13 Cal.3d 757, 775.)

Such an intent may be quite clear on the face of a particular provision—for example, it is plain that California Constitution article I, section 19,

which provides that "[p]rivate property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner," supports an action for money damages, and our cases consistently have so held. (See cases cited *ante*, fn. 11.) But with regard to most constitutional provisions, the words of the provision do not on their own manifest any such intent.

The due process clause of article I, section 7(a), falls within this latter category. It states in relevant part: "A person may not be deprived of life, liberty, or property without due process of law . . . ." These words do not explicitly disclose an intent either to authorize or to withhold damages as a remedy for a violation of the provision. Accordingly, we must look further in our attempt to discern whether article I, section 7(a) was intended to include a damages remedy.

1.

In considering evidence of an implied right to seek damages, we shall review the available drafting history of the provision at issue and materials that were before the voters when they adopted the measure.

Article I, section 7(a) was added to the state Constitution by the adoption of Proposition 7 on the November 1974 ballot. (See *Gates, supra,* 32 Cal.App.4th at pp. 522-524.) The ballot pamphlet provided to all voters prior to the general election in 1974 explained that the measure was designed to revise article I, the California Constitution's declaration of rights, in a number of respects, one of which was to set out some basic rights that were then "presently . . . contained in the federal Constitution" but not listed in the state charter. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) analysis of Prop. 7, p. 26.) Among such rights, the Legislative Analyst explained, was the following right: "(b) *A person may not be deprived of life, liberty, or property without due process of the law.*" (*Ibid.*, italics added.)

Although the state Constitution long had contained a similarly worded due process provision prior to 1974 (see Cal. Const., former art. I, § 13 ["No person shall be . . . deprived of life, liberty, or property without due process of law"]; Cal. Const. of 1849, art. I, § 8 [same]), the previous incarnations of the state constitutional due process right were contained within broad provisions setting forth the rights of criminal defendants. The 1974 amendment, placing the clause in article I, section 7(a), was designed to make it clear that

the due process guarantee applied not only in criminal prosecutions, but afforded a general civil right as well.[18]

We have reviewed the relevant passages of the debates that preceded adoption of the 1849 and 1879 Constitutions. (See Browne, Rep. of the Debates in Convention of Cal. on Formation of State Const. (1850) pp. 30-31, 41 [adopting the due process language without debate], 474-475 [Address "To the People of California," introducing the proposed Constitution]; 2 Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878-1879, pp. 1188-1189, 1425-1426, 1491, 1509 [adopting the due process language without debate], 1521-1524 [Address "To the People of the State of California," introducing the proposed Constitution].) The parties have not cited, nor have we discovered, any indication in these materials suggesting that the drafters considered the question whether the predecessors to article I, section 7(a) would provide a remedy in damages for violation of the liberty interest of the due process clause. (Cf. *Walinski, supra,* 377 N.E.2d 242, 243-245 [drafters of the Illinois Constitution's antidiscrimination clause intended to create a right to enforce that provision through action for damages]; *Brown, supra,* 89 N.Y.2d 172, 189 [674 N.E.2d 1129, 1139-1140] [drafters of the New York Constitution assumed that damages would be allowed to remedy state search and seizure violations, and implicitly approved allowing that remedy].) Nor have we discovered any evidence that the drafters of the 1974 revision, which as noted broadened the due process guarantee so as to afford both criminal and civil rights, considered the issue or had any such intent. (See Cal. Const. Revision Com., Article I (Declaration of Rights) Background Study 2 (Aug. 1969) pp. 6-16 [concerning proposed revision of former article I, section 21]; *id.,* Background Study 4 (Dec. 1969) pp. 19-28 [concerning proposed revision of former article I, section 13]; Cal. Const. Revision Com., Article I (Declaration of Rights) Rep. II (Jan. 1970) pp. 3-5 [concerning proposed revision of former art. I, § 21]; *id.,* Rep. IV (Feb. 1970) pp. 6-10 [concerning proposed revision of former art. I, § 13]; Cal. Const. Revision Com., Proposed Revision, *supra,* p. 24 [concerning the right to due process in criminal proceedings]; *id.,* at p. 29 [concerning extension of civil rights of due process and equal protection]; see generally Cal. Const. Revision Com., Rep., Materials Relating to

---

[18]Commenting upon the then existing article I, section 21, which provided that no citizen shall be granted privileges or immunities not also granted to all other citizens (see current article I, section 7, subdivision (b)), the California Constitution Revision Commission proposed to maintain that prohibition, but also to add "a clause granting equal protection and due process of law to all persons. Although the Fourteenth Amendment to the Federal Constitution assures due process and equal protection, the Commission believes that our fundamental legal document should also provide these guarantees." (Cal. Const. Revision Com., Proposed Revision (pt. 5, 1971) p. 29 [comment on proposed article I, section 23, the substance of which subsequently became art. I, § 7, subds. (a) and (b)].)

Provisions in Cal. Const. Recommended or Endorsed by Com. (Dec. 10, 1974) pp. 74-82.)

We also have examined the materials that were placed before the voters when the provision last was amended in 1974. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) Prop. 7.) Like the Court of Appeal in *Gates, supra,* 32 Cal.App.4th 481, which examined these same materials in order to consider the voters' implied intent to create a damages remedy with respect to the equal protection clause of article I, section 7(a) (*Gates,* at pp. 522-524), we find nothing in the ballot materials to suggest that the voters affirmatively intended to create, within article I, section 7(a), a damages remedy with respect to the due process clause set forth in this constitutional provision.[19] Indeed, there is nothing to suggest that the issue was considered at all.

As noted above, one recent decision, *Bonner, supra,* 45 Cal.App.4th 1465, concluded otherwise, finding that the voters in 1974 intended to permit an action for damages to remedy a state due process violation if there is no alternative remedy. The court in *Bonner* reasoned that because the voters' pamphlet in 1974 advised that Proposition 7 would add rights "presently . . . contained in" the federal charter, and because in *Davis, supra,* 442 U.S. 228, the United States Supreme Court construed the equal protection component of the *federal* due process clause to permit a damages remedy for a violation in circumstances in which no other remedy was available, the voters who adopted Proposition 7 must have intended to provide a damages remedy for a state constitutional due process violation whenever a plaintiff has no alternative (or effective) remedy.

We find *Bonner*'s voter intent analysis to be unpersuasive, and adopt the critique of that conclusion set out in *Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809. As the Court of Appeal in *Carlsbad Aquafarm* pointed out: "First, *Davis v. Passman, supra,* 442 U.S. 228, and the subsequent United States Supreme Court authority relied upon by *Bonner* were decided *after* Proposition 7's adoption by the voters. It is not reasonable to infer from the single statement in the voter's pamphlet that the voters would have predicted the United States Supreme Court's extension of *Bivens* to a procedural due process claim. Second, the language in the voter pamphlet relied upon by the *Bonner* court states only that Proposition 7 puts 'rights' into the state Constitution that ' "presently are contained in the federal Constitution." '

[19]Defendants purport to find in the ballot pamphlet an intent to bar damages claims, based upon the statement therein, by the Legislative Analyst, that "[t]his proposition does not increase government costs." (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) analysis of Prop. 7, p. 26.) We do not read this line from the ballot pamphlet as reflecting any intent to preclude actions for damages for the violation of any right set out by the ballot measure.

(*Bonner, supra,* 45 Cal.App.4th at p. 1474, italics omitted.) This statement does not necessarily mean the voters would have understood they were adopting the analysis of the United States Supreme Court with respect to the existence of a damages remedy pertaining to those rights." (*Carlsbad Aquafarm, supra,* 83 Cal.App.4th at p. 819.)

Plaintiff concedes that *Bonner*'s analysis of voter intent is unpersuasive, but insists nevertheless that the voters must have intended to provide a damages remedy because without such a remedy the provision's adoption would be a "vain and meaningless act" and "any other construction [of the provision] would . . . make its language a mere mockery . . . ." We are unpersuaded. Even if the due process right embodied in article I, section 7(a) is enforceable only through an action for injunctive or declaratory relief, and not by an action for damages, this constitutional provision is hardly rendered innocuous or empty.

We conclude that the materials that were before the voters when they adopted the current version of article I, section 7(a) in November 1974, provide no basis upon which to infer an intent that the provision itself permit an action for damages to remedy a violation of that clause.

2.

We next consider the extent to which the provision, even if not setting forth an explicit indication of a right to damages, nevertheless contains "guidelines, mechanisms, or procedures from which a damages remedy could be inferred." (*Leger, supra,* 202 Cal.App.3d at p. 1455; *Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809, 822.) The presence of such express or implied guidelines, mechanisms, or procedures may support an inference that the provision was intended to afford such a remedy.

Again, we agree with the court in *Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809, which, addressing this consideration in the context of alleged violations of the right to procedural due process, observed that article I, section 7(a) neither includes nor suggests any such guidelines, mechanisms, or procedures, but instead "reflects general principles ' " 'without laying down rules by means of which those principles may be given the force of law.' " ' (See *Leger, supra,* 202 Cal.App.3d at p. 1455.)" (*Carlsbad Aquafarm, supra*) 83 Cal.App.4th at p. 822.) Although plaintiff asserts that California courts are *capable* of fashioning procedures to govern damage claims in this context, and this may be so, it is not relevant to the point here at issue. The question at this stage of the analysis is whether there are guidelines, mechanisms, or procedures set out in (or reasonably inferable

from) the provision itself from which we may infer that the voters, in adopting article I, section 7(a), affirmatively intended that the provision permit an action for damages to remedy a violation of that clause. Article I, section 7(a) contains no such guidelines, mechanisms, or procedures.

3.

In considering evidence of an implied right to seek damages, we also believe it appropriate to examine, as have sister state jurisdictions that have permitted damage suits to remedy search and seizure violations, common law history from which we might infer, within the provision at issue, an intent to provide an action for damages to remedy a violation of that provision. (See *Brown, supra,* 89 N.Y.2d 172, 188-189 [674 N.E.2d 1129, 1138-1139]; *Widgeon, supra,* 479 A.2d 921, 923-925; *Moresi, supra,* 567 So.2d 1081, 1091-1093.)

For example, in recognizing a right to damages to remedy a violation of the state search and seizure and equal protection provisions, the New York Court of Appeals observed that "the courts have looked to the common-law antecedents of the constitutional provision to discover whether a damage remedy may be implied. New York's first Constitution in 1777 recognized and adopted the existing common law of England and each succeeding Constitution has continued that practice. Thus, in some cases, there exist grounds for implying a damage remedy based upon preexisting common-law duties and rights." (*Brown, supra,* 89 N.Y.2d 172, 188 [674 N.E.2d 1129, 1138].)

The court in *Brown* found such grounds for implying a right of action. First, the court observed, "[t]he prohibition against unlawful searches and seizures originated in the Magna Carta and has been part of our statutory law since 1828. The civil cause of action was fully developed in England and provided a damage remedy for the victims of unlawful searches at common law (*see, Huckle v. Money,* 2 Wils. 205, 95 Eng. Rep. 768 [1763]; *Wilkes v. Wood,* Lofft 1, 98 Eng. Rep. 489 [1763]; *Entick v. Carrington,* 19 State Tr. 1029, [1558-1774] All ER Rep. 41 [1765])." (*Brown, supra,* 89 N.Y.2d 172, 188 [674 N.E.2d 1129, 1139], brackets in *Brown.*) Second, the court in *Brown* observed that this English common law rule had been endorsed and accepted by the New York court and by the drafters of the most recent state

constitution (*ibid.*),[20] and hence found historical support for an implied remedy in damages. Similar reasoning supporting an action for damages to remedy a search and seizure violation has been embraced by the high courts of Maryland[21] and Louisiana.[22]

---

[20]The court in *Brown* observed that in *People v. Defore* (1926) 242 N.Y. 13, 19, 24 [150 N.E. 585, 586-587, 588-589], Judge Cardozo, speaking for the court, cited the same English authority in concluding that evidence obtained in violation of the search and seizure clause could be used against the defendant in a criminal trial and that the defendant's remedy for the wrong consisted of a civil suit for damages. (*Brown, supra*, 89 N.Y.2d 172, 189 [674 N.E.2d 1129, 1139].) The court in *Brown* also stated: "[T]he availability of a civil suit for damages sustained as the result of a constitutional violation was contemplated by the delegates to [New York's] Constitutional Convention of 1938. They did not consider whether [such a suit] was desirable—they assumed a civil remedy already existed. At least that is so with respect to section 12 [the search and seizure provision]. The debates over the proposed exclusion of evidence unlawfully obtained in criminal proceedings make that abundantly clear. [¶] . . . Based upon [Judge] Cardozo's [opinion in *People v. Defore*], the Convention delegates assumed that damages were available to the victim of unconstitutional action and they used that argument to help persuade the Convention that exclusion was unnecessary to deter official misconduct (*see*, 1 Rev. Record of N.Y. Constitutional Convention, 1938, at 416, 425, 459). These debates reveal that the concept of damages for constitutional violations was neither foreign to the delegates nor rejected by them. That the Convention adopted the equal protection provision without similarly discussing the damage remedy does not establish that the delegates disfavored it nor does it foreclose our consideration of that relief." (*Ibid.*, fn. omitted.)

[21]In *Widgeon, supra*, 479 A.2d 921, the Maryland Supreme Court described in detail the three English cases cited above (*id.*, at pp. 924-925) and then observed that Maryland courts long had expressly endorsed the rule of those cases. (*Id.*, at p. 925, citing *Blum v. State* (1902) 94 Md. 375, 384-385 [51 A. 26].) The court continued: "Moreover, in *Meisinger v. State*, 155 Md. 195 [141 A. 536] (1928), in which this Court rejected the argument that evidence obtained by unlawful searches and seizures under Article 26 of the Declaration of Rights should generally be excluded from criminal trials, both the majority opinion and the dissenting opinion recognized the alternate availability of a civil action for damages. 155 Md. at 199 . . . . [¶] Legal scholars also have long taken the position that an unlawful search and seizure gives rise to a damage action against both the officer executing an illegal warrant and the official causing it to issue. . . . Fraenkel, *Concerning Searches and Seizures*, 34 Harv. L. Rev. 361, 363-364 (1921). See Cornelius, Search & Seizure §§ 480, 484 (2d ed. 1930); H.D. Evans, *Maryland Practice—A Treatise on the Course of Proceeding in the Common Law Courts of the State of Maryland 61-62 (1867); 2 Sutherland on Damages* § 412 (4th ed. 1916); 8 Wigmore on Evidence § 2183 (McNaughten rev. 1961)." (*Widgeon, supra*, 479 A.2d at p. 925.)

[22]In *Moresi, supra*, 567 So.2d 1081, the Louisiana Supreme Court observed: "Under the common law of England, where individual rights, such as those protected by [the search and seizure clause of the Louisiana Constitution], were preserved by . . . the Magna Carta . . . , a violation of those rights generally could be remedied by a traditional action for damages. The violation of the constitutional right was viewed as a trespass, giving rise to a trespass action. [Citing, among other cases, the English decisions.]" (*Moresi, supra*, 567 So.2d 1081, 1092.) The court continued: "Considering the expression of the framers in the textual formula of [the constitutional provision], the history of the provision as recorded in the convention proceedings, and . . . [the provision's] English constitutional law antecedents, we conclude that damages may be obtained by an individual for injuries or loss caused by a violation" of the search and seizure clause of the state constitution. (*Ibid.*)

The parties have not cited, nor have we found, any similar history with respect to the liberty interest set out in article I, section 7(a), or its predecessors, former article I, section 13, and article I, section 8, of the Constitution of 1849.[23]

We conclude that there is no indication in the language of article I, section 7(a), nor any evidence in the history of that section, from which we may find, within that provision, an implied right to seek damages for a violation of the due process liberty interest.

## B.

This determination, however, does not end our inquiry. Just as we have not discovered any basis for concluding that a damages remedy was contemplated or reasonably might be inferred within article I, section 7(a) for violation of that provision, we also have not discovered any basis for concluding that a damages remedy was intended to be foreclosed. In such circumstances, we, like the United States Supreme Court and the courts of numerous other jurisdictions that have faced similar circumstances, shall proceed to consider whether a constitutional tort action for damages to remedy the asserted constitutional violation should be recognized.

As observed by Friesen, "[*Bivens, supra,* 403 U.S. 388, and its progeny] actually illustrate[] a body of precedent established by state courts, . . . [and] expressed in section 874A of the Second Restatement of Torts." (Friesen, *supra,* § 7-5(c), at p. 420.)

 The cited Restatement section provides: "When a legislative [or constitutional] provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, *the*

---

[23]Plaintiff argues that the court in *Melvin v. Reid* (1931) 112 Cal.App. 285 [297 P. 91] (*Melvin*) permitted a cause of action for damages to remedy a constitutional violation, and that hence, by analogy, such an action should be recognized in the present case as well. Plaintiff, however, misreads *Melvin*. In that case, the Court of Appeal, citing article I, section 1 (which provides that all people have "inalienable rights" among which are "pursuing and obtaining safety [and] happiness"), recognized a common law tort action based upon allegations that the defendants had made a motion picture depicting the plaintiff's earlier "shameful" life, using her real name. In allowing the action, the court in *Melvin* found in article I, section 1's guarantee of "pursuing and obtaining safety and happiness," a policy supporting a common law tort action for invasion of privacy. (*Melvin, supra,* 112 Cal.App. 285, 291-292; see also *id.,* at p. 287, citing Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv. L.Rev. 193 [advocating recognition of common law right].) As subsequent cases make clear, however, *Melvin* cannot properly be read as authorizing an action directly under article I, section 1, for damages to remedy a violation of that provision. Instead, *Melvin* represents the foundation, in California, of the common law invasion of privacy tort. (See, e.g., *Briscoe v. Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 534 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1].)

*court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision,* accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action." (Rest.2d Torts, § 874A, bracketed material and italics added; see also *id.,* com. (a), p. 301 ["legislative provision" includes constitutional provisions].)[24]

In determining whether to recognize such a constitutional tort, courts have "look[ed] for the policy behind the legislative [or constitutional] provision, attempting to perceive the purpose for which it was enacted, and then, having ascertained that policy or purpose, [have] determine[ed] the most appropriate way to carry it out and identif[ied] the remedy needed to accomplish that result." (Rest.2d Torts, § 874A, com. (d), p. 303.)[25]

We join the jurisdictions that have endorsed, implicitly or explicitly, the view set out in the Restatement, that courts, exercising their authority over the common law, may, in appropriate circumstances, recognize a tort action for damages to remedy a constitutional violation. (See Rest.2d Torts, § 874A, com. (g), pp. 306-308; Friesen, *supra,* at § 7-5(c), pp. 420-421.) We proceed to determine whether a tort action for damages is appropriate here.

1.

We first consider the adequacy of existing remedies. (See, e.g., Rest.2d Torts, § 874A, com. (h)(2), p. 309; *Carlson, supra,* 446 U.S. 14, 20-23 [100 S.Ct. 1468, 1472-1474]; *Davis, supra,* 442 U.S. 228, 245 [99 S.Ct. 2264, 2277]; *Bush, supra,* 462 U.S. 367, 381-388 [103 S.Ct. 2404, 2413-2417]; *Schweiker, supra,* 487 U.S. 412, 424-429 [108 S.Ct. 2460,

---

[24]As observed in Friesen, *supra,* section 7-5(c), at page 420, "[t]he reporter for the Second Restatement used the words 'legislative provision' in section 874A to describe the duty-creating element of this tort, but, as *comment a* to the section explains, 'legislative provision' includes *constitutional* provisions . . . ." (See also *id.,* at pp. 422-423 [comparing and contrasting a section 874A cause of action with the "negligence per se" doctrine]; Rest.2d Torts, § 874A, com. (e), pp. 303-304 [same].)

[25]As the drafters of the Restatement explained: "This process requires policy decisions by the court, and it should be aware of them and face them candidly. In these cases, it is the court itself that is according a civil remedy to the injured party. The action is in furtherance of the purpose of the legislation [or constitutional provision] and is stimulated by it, but what is involved is judicial rather than legislative modification of the existing law. The court is not required to provide a civil remedy, and yet judicial tradition gives it the authority to do so under appropriate circumstances. The court has discretion and it must be careful to exercise that discretion cautiously and soundly." (Rest.2d Torts, § 874A, com. (d), p. 303; accord, *Spackman, supra,* 16 P.3d 533, 538; see also Rest.2d Torts, § 874A, com. (h)(1)-(6), pp. 308-310 [setting out factors "to which a court may be expected to give consideration in determining whether a tort remedy is appropriate and needed"].)

2468-2471]; *Malesko, supra,* 534 U.S. 61, 71-75 [122 S.Ct. 515, 522-523]; *Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809, 821; *Dick Fischer, supra,* 838 P.2d 263, 268; *Kelley, supra,* 627 A.2d 909, 923; *Sundheim, supra,* 926 P.2d 545, 549-553; *Rockhouse, supra,* 503 A.2d 1385, 1388-1389; *Provens, supra,* 594 N.E.2d 959, 963-965; *Shields, supra,* 658 A.2d 924, 929-934; *Spackman, supra,* 16 P.3d 533, 537-539.)

We conclude that this consideration does not support recognition of a constitutional tort cause of action for damages to remedy an asserted violation of the due process "liberty" interest under article I, section 7(a). In addressing a similar issue in *Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809, the Court of Appeal reasoned: "Under Code of Civil Procedure section 1085, Aquafarm could have immediately petitioned the superior court for a writ of mandate ordering [the] Department to provide it with due process before it refused to reissue a [required form]. [Citations.] The essence of Aquafarm's due process claim was that it wanted a hearing to permit a neutral decision maker to determine whether [the] Department was correct in its determination that it had not complied with [national shellfish safety] standards. If Aquafarm had promptly filed for a writ of mandate, rather than waiting 14 months to file a civil complaint seeking compensatory damages, it could have achieved this desired objective." (*Id.,* at p. 821, fn. omitted.)

The same can be said here. As the Court of Appeal below observed, instead of attempting to proceed against defendants by asserting an action for damages, plaintiff could have sought to remedy the alleged violation of his due process liberty interest and his concomitant right to a "name-clearing hearing" by seeking a writ of mandate under Code of Civil Procedure section 1085, compelling defendants to provide a name-clearing hearing.[26] Indeed, it seems ironic that, whereas in his pleadings below and in his briefs before this court plaintiff frames the issue narrowly—as whether he is entitled to damages to remedy defendants' failure to provide him with a timely name-clearing hearing—in fact, plaintiff himself did not timely seek to compel such a hearing through an action under section 1085.[27] Moreover, plaintiff also could have sought to establish a violation of his due process liberty interest by seeking declaratory or injunctive relief. (See *ante,* pt. II.)

[26]The Court of Appeal below observed, "[a]t oral argument the Regents stressed that 'at all times' [plaintiff] had the right to a hearing under University policies. The Regents argued [plaintiff] had waived that right by failing to request a hearing."

[27]Although the parties have not discussed the point, had plaintiff timely sought a writ of mandate under section 1085 and prevailed in that action, plaintiff might have been entitled to obtain damages in such an action pursuant to Code of Civil Procedure section 1095, which provides in relevant part that "[I]f judgment be given for the applicant [in a mandate proceeding under section 1085], the applicant may recover the damages which the applicant has sustained . . . ." (See, e.g., *Apte v. Regents of University of California* (1988) 198 Cal.App.3d 1084, 1099-1100 [244 Cal.Rptr. 312].)

In addition, plaintiff had an adequate remedy for the alleged delay in offering an adequate "name-clearing hearing," by way of a defamation action. As the Regents observe, "because a plaintiff who timely sues for defamation may obtain damages for reputational injury, such damages are an adequate remedy for any actionable 'delay' in providing a name-clearing hearing—whose sole purpose is to protect the plaintiff's reputation."[28]

The availability of these adequate alternative remedies militates against judicial creation of a tort cause of action for damages in the circumstances presented.[29]

2.

We next consider the extent to which a constitutional tort action would change established tort law. (See Rest.2d Torts, § 874A, com. (h)(5), p. 310.)

Plaintiff suggests that a damages action to remedy an asserted violation of his due process liberty interest is contemplated by tort law as codified by Civil Code sections 1708 and 3333. The former section provides that "[e]very person is bound, without contract, to abstain from injuring the person or property of another, *or infringing upon any of his rights*." (Civ. Code, § 1708, italics added.) The latter statute provides, "for the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could be anticipated or not." (Civ. Code, § 3333.) Echoing the majority in *Laguna Publishing, supra,* 131 Cal.App.3d 816, which placed some reliance upon these statutes, plaintiff suggests that the asserted due process violation in this case falls within the ambit of section 1708, and that the violation "imports by reason of section 3333 a correlative right to recover any damages proximately resulting from the violation of such right . . . ." (*Laguna Publishing*, at p. 854.)

As Justice Kaufman observed in his concurring and dissenting opinion in *Laguna Publishing*, however, Civil Code "section 3333 is not a substantive statute; it merely prescribes the general measure of damages in tort cases. Civil Code section 1708[,] which provides that every person is bound to abstain from injuring the person or property of another or infringing any of

---

[28]Indeed, as is revealed by documents that we have judicially noticed, plaintiff initially sued the Regents and various Doe defendants for defamation, but dropped that claim prior to the trial court's ruling on the demurrer to that claim.

[29]In this case, we need not and do not determine what role the availability of a federal law remedy (for example, under 42 U.S.C. § 1983) should play in the determination whether a state action for damages should be recognized for violation of a state constitutional provision.

his rights, states a general principle of law, but it hardly provides support for the adoption of the novel legal proposition that a violation of subdivision (a) of section 2 of article I of the California Constitution gives rise to a direct cause of action for damages outside the parameters of recognized tort law . . . ." (*Laguna Publishing, supra,* 131 Cal.App.3d 816, 859 (conc. & dis. opn. of Kaufman, J.).) We reject plaintiff's contention that a damages action to remedy an asserted violation of his due process liberty interest is contemplated by tort law as codified by Civil Code sections 1708 and 3333.

3.

We also consider the nature of the provision and the significance of the purpose that it seeks to effectuate. (Rest.2d Torts, § 874A, com. (h)(1) & (4), pp. 308-310.) As a general matter, the due process "liberty" interest of article I, section 7(a) is both important and fundamental.

Plaintiff relies upon *Laguna Publishing, supra,* 131 Cal.App.3d 816, in which the Court of Appeal majority stressed the *"special dignity"* of the rights of free speech and free press, while finding a right to seek damages to remedy a violation of the state free speech and free press clause, article I, section 2(a). (*Laguna Publishing, supra,* 131 Cal.App.3d at p. 853, italics in original.) Subsequently, the court in *Fenton, supra,* 135 Cal.App.3d 797, reached a similar conclusion concerning a violation of the right to vote (Cal. Const., art. II, § 2), relying upon *Laguna Publishing,* and the asserted "special dignity" of the right to vote. Plaintiff asserts that a similar conclusion applies here.

Although we may agree that this factor, in the abstract, is a consideration that favors recognition of a constitutional tort action for damages, we also find persuasive the cautionary view set out in *Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809: "While this factor may be a proper consideration in the overall analysis, it is not one upon which we place great significance. How does one rank the importance of different constitutional provisions? . . . [C]an we say a procedural due process right should be accorded more or less dignity [than free speech or voting rights]? We agree that the due process right is fundamental. ▮▮▮ *But absent the applicability of the other relevant factors discussed here, the relative importance of the constitutional right is of little help in determining the availability of a damages remedy for a violation of that right.*" (*Id.,* at p. 823, italics added.)[30]

▮▮▮ The same can be said here. The availability of meaningful alternative remedies leads us to decline to recognize a constitutional tort to remedy the asserted violation of article I, section 7(a) in the case before us.

---

[30]In light of our analysis, we disapprove the methodology employed by the courts in *Laguna Publishing v. Golden Rain Foundation, supra,* 131 Cal.App.3d 816, and *Fenton v. Groveland Community Services Dist., supra,* 135 Cal.App.3d 797, to the extent it is

## 4.

Because we conclude that the foregoing factors militate against recognition of a constitutional tort to remedy the asserted violation of due process liberty interests in this case, we need not consider, in addition, whether any special factors would counsel hesitation in recognizing such a damages action. ■ If we had found, however, that the considerations discussed above favored recognition of a constitutional tort, we would, before actually recognizing the tort, also consider the existence of any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment,[31] avoidance of adverse policy consequences,[32] considerations of governmental fiscal policy,[33] practical issues of proof,[34] and competence of courts to assess particular types of damages.[35]

## V.

■ In sum, we discern no evidence from which to infer within article I, section 7(a), an intent to afford a right to seek damages to remedy the asserted violation of the due process liberty interest alleged in this case. We also find no basis upon which to recognize a constitutional tort action for such damages.

The judgment of the Court of Appeal is affirmed.

Kennard, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

---

inconsistent with this opinion. We express no view on the correctness of the results reached in those cases.

[31]See *Bush, supra,* 462 U.S. 367, 370 [103 S.Ct. 2404, 2407]; *Schweiker, supra,* 487 U.S. 412, 427, 429 [108 S.Ct. 2460, 2469-2470, 2470-2471]; *Meyer, supra,* 510 U.S. 471, 486 [114 S.Ct. 996, 1005-1006]; *Chappell, supra,* 462 U.S. 296, 304 [103 S.Ct. 2362, 2367-2368]; see also *Kelley, supra,* 627 A.2d 909, 922; *Smith v. Department of Public Health* (1987) 428 Mich. 540 [410 N.W.2d 749, 789] (opn. by Brickley, J.) *(Smith)*; *77th Dist. Judge, supra,* 438 N.W.2d 333, 337; *Spackman, supra,* 16 P.3d 533, 539.

[32]See *Kelley, supra,* 627 A.2d 909, 923-924; *Malesko, supra,* 534 U.S. 61, 70-71 [122 S.Ct. 515, 521]; *Meyer, supra,* 510 U.S. 471, 485 [114 S.Ct. 996, 1005]; *Smith, supra,* 410 N.W.2d 749, 789 (opn. by Brickley, J.); see generally Rest.2d Torts, § 874A, com. (h)(3), pp. 309-310.)

[33]See *Meyer, supra,* 510 U.S. 471, 486 [114 S.Ct. 996, 1005-1006]; *Bivens, supra,* 403 U.S. 388, 396 [91 S.Ct. 1999, 2004-2005]; *King v. Alaska State Housing Authority* (Alaska 1981) 633 P.2d 256, 259-261; *Kelley, supra,* 627 A.2d 9U9, 924. In a related vein, it has been suggested that courts also should consider "[t]he burden that the new cause of action will place on judicial machinery." (Rest.2d Torts, § 874A, com. (h)(6), p. 310.)

[34]See *Carlsbad Aquafarm, supra,* 83 Cal.App.4th 809, 822.

[35]See *Bivens, supra,* 403 U.S. 388, 408-409 & footnote 9 [91 S.Ct 1999, 2011] (conc. opn. of Harlan, J.); see also Restatement Second of Torts, section 874A, comment (h)(3), pages 309-310.

**BROWN, J.,** Concurring and Dissenting.—I concur in the majority's affirmance of the Court of Appeal's judgment barring plaintiff from seeking damages for any violation of his state constitutional right to due process. In my view, however, it is not only unnecessary but entirely inappropriate to go beyond the short, clear answer to the question presented or to consider anything other than the constitutional history and drafters' intent in determining whether a constitutional provision is enforceable by an action in tort. The majority cites no authority and offers no rationale for applying the "constitutional tort" analysis adopted by the United States Supreme Court in *Bivens v. Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388 [91 S.Ct. 1999, 29 L.Ed.2d 619] to a provision of the California Constitution.

"[I]t is well established that the California Constitution 'is, and always has been, a document of independent force' [citation], and that the rights embodied in and protected by the state Constitution are not invariably identical to the rights contained in the federal Constitution. [Citation.] California cases long have recognized the independence of the California Constitution [citation], and article I, section 24, of the California Constitution expressly confirms that the rights 'guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution.' Past cases make clear that even when the terms of the California Constitution are textually identical to those of the federal Constitution, the proper interpretation of the state constitutional provision is not invariably identical to the federal courts' interpretation of the corresponding provision contained in the federal Constitution. [Citations.]" (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 325-326 [66 Cal.Rptr.2d 210, 940 P.2d 797]; see *People v. Frazer* (1999) 21 Cal.4th 737, 782-783 [88 Cal.Rptr.2d 312, 982 P.2d 180] (dis. opn. of Brown, J.); *Warden v. State Bar* (1999) 21 Cal.4th 628, 660 [88 Cal.Rptr.2d 283, 982 P.2d 154] (dis. opn. of Brown, J.).)

When a part of our state Constitution has been adopted by initiative, one of our core interpretive principles is that the courts must measure its scope according to the intentions of the voters. (*Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 518 [38 Cal.Rptr.2d 489], and cases cited therein; see, e.g., *White v. Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222] [ballot statements indicated state constitutional right of privacy was intended to be self-executing and supported injunctive relief]; cf. *Holtz v. Superior Court* (1970) 3 Cal.3d 296, 302 [90 Cal.Rptr. 345, 475 P.2d 441] [language of article I, section 14, allows monetary damages for inverse condemnation].) "This is because the Constitution ' "owes its whole force and authority to its ratification by the people . . . ." ' [Citations.]" (*Gates*, at p. 518.)

The majority correctly concludes there is no evidence the voters intended to create a right to monetary damages in adopting the due process clause set

forth in article I, section 7, subdivision (a) of our Constitution. Nevertheless, it declines to end its inquiry with that determination because it finds no basis "for concluding that a damages remedy was intended to be foreclosed." (Maj. opn., *ante*, at p. 324.) The majority fails to explain this non sequitur, however, and to identify any principle of constitutional interpretation that translates the absence of an express or implied bar to monetary damages into an authorization for a court to determine whether to provide for such a remedy on its own initiative. By its very nature, a constitution orders the relationships of the government and its citizens and serves as a bulwark against encroachment on their rights. The fact that the judicial branch interprets the Constitution does not give license to augment its provisions as any shifting majority of judges sees fit. Until now, this court has jealously guarded its role in effectuating legislative intent, particularly with respect to the initiative process. (See, e.g., *Legislature v. Eu* (1991) 54 Cal.3d 492, 501 [286 Cal.Rptr. 283, 816 P.2d 1309]; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 341 [276 Cal.Rptr. 326, 801 P.2d 1077]; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 248 [149 Cal.Rptr. 239, 583 P.2d 1281]; see also *In re Lance W.* (1985) 37 Cal.3d 873, 889-890 [210 Cal.Rptr. 631, 694 P.2d 744].) In this case, however, the majority abandons that vigilance.

Moreover, the majority applies an analytical framework based not on our own jurisprudence but a derivation of United States Supreme Court decisions. "The California Constitution is the supreme law of our state—a seminal document of independent force that establishes governmental powers and safeguards individual rights and liberties. [Citations.] As the Supreme Court of California, we are the final arbiters of the meaning of state constitutional provisions. [Citation.] Our authority and responsibility in this regard is part of the basic structure of California government; it cannot be delegated to the United States Supreme Court or any other person or body. [Citation.] When we construe provisions of the California Constitution, we necessarily do so in light of their unique language, purposes, and histories, in accordance with general principles of constitutional interpretation established in our case law. Nor do we act differently when the state constitutional provision in issue contains the same language as a federal constitutional provision. In such a case, we are not bound by a decision of the United States Supreme Court or any other court. We must consider and decide the matter independently." (*Sands v. Morongo Unified School Dist.* (1991) 53 Cal.3d 863, 902-903 [281 Cal.Rptr. 34, 809 P.2d 809] (conc. opn. of Lucas, C. J.).)

The majority's lapse of analytical independence—and apparent "assumption that any Supreme Court doctrine is generic constitutional law" (Linde,

*Are State Constitutions Common Law?* (1992) 34 Ariz. L.Rev. 215, 227)—betrays our obligation as final arbiter of state constitutional law in two interrelated ways. First, the majority's approach compounds and perpetuates the misperception that state constitutions are part of common law and that meaningful analysis can be "borrowed wholesale from federal constitutional discourse, as though the language of federal constitutional law were some sort of lingua franca of constitutional argument generally." (Gardner, *The Failed Discourse of State Constitutionalism* (1992) 90 Mich. L.Rev. 761, 766.) Unlike the common law, however, constitutional interpretation is bound by text as well as by principles of construction and is decidedly *not* subject—whenever a majority of the court agrees—to judicial extension and innovation in the interest of public policy or national consensus or similar justification. (See Linde, at pp. 225-229.) Although in this context "[t]he pull toward a common law of judicial review, toward a vortex of clichés [lifted from United States Supreme Court decisions], is strong" (*id.* at p. 229), this court must resist if it is to remain faithful to its role as the final arbiter of the meaning of our state Constitution and to respect the demarcations between the respective branches of government—a concern equally of constitutional dimension. (See, e.g., *Schweiker v. Chilicky* (1988) 487 U.S. 412, 414 [108 S.Ct. 2460, 2463, 101 L.Ed.2d 370].)

Second, the majority's approach creates a lacuna in our constitutional jurisprudence, adopting without meaningful consideration the United States Supreme Court's interpolation of an unrelated federal constitutional provision in lieu of rigorous substantive analysis of the unique language, purpose and history of our own due process guarantee. Defaulting to the high court fundamentally disserves the independent force and effect of our Constitution. Rather than enrich the texture of our law, this reliance on federal precedent shortchanges future generations.

Baxter, J., concurred.