[No. A116389. First Dist., Div. Four. Aug. 26, 2008.]

MICHAEL CHRISTOPH KREUTZER, Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

COUNSEL

Dennis J. Herrera, City Attorney, Elizabeth S. Salveson, Chief Labor Attorney, Danny Chou, Chief of Appellate Litigation, Terrence J. Howzell and Michael J. Leon Guerrero, Deputy City Attorneys, for Defendant and Appellant.

Ann Miller Ravel, County Counsel (Santa Clara) and Kathryn J. Zoglin, Deputy County Counsel, for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Defendant and Appellant.

Law Offices of Michael S. Sorgen, Michael S. Sorgen and Andrea Adam Brott for Plaintiff and Respondent.

OPINION

**RUVOLO, P. J.**—In this opinion, we conclude that a government employee hired into a position expressly classified as exempt from civil service is not entitled to the protections of the civil service system upon the employee's release from the position, even if a court finds that, based on the duties of the position, it should not have been classified as exempt. We also hold that where a government employee is released from employment for reasons characterized only as nondisciplinary, and not otherwise publicly disclosed, the employee's liberty interest in reputation has not been infringed, and the employee is entitled to no relief. Accordingly, we reverse the trial court's judgment in this case, which ordered a government employer to reinstate a former exempt employee into a nonexempt position.

## I. FACTS AND PROCEDURAL BACKGROUND

Dr. Michael Christoph Kreutzer, the respondent on this appeal, is a licensed physician who is board certified in both adult psychiatry and child and adolescent psychiatry. He is fluent in Spanish, French, and German, as well as English.

Dr. Kreutzer was first hired by appellant City and County of San Francisco (City) in 1994, as the half-time medical director of the Southeast Child & Family Therapy Center (Southeast). The process by which Dr. Kreutzer was hired for this position included an interview with Dr. Albert DeRanieri, an exempt medical director for the City who also worked part time at Southeast, as well as interviews with other City personnel. However, Dr. Kreutzer did

not take a formal, posted civil service examination for his position, and was not placed on or hired from an eligible list.

The position to which Dr. Kreutzer was appointed in 1994 was classified by the City's Civil Service Commission (Commission) as falling within class 2230, Physician Specialist, which is exempt from the City's civil service system. When he was hired, Dr. Kreutzer signed an "Appointment Processing" form indicating that he was an "exempt-perm[anent]" employee, but the form did not have the box for "non-civil service" checked.[1] Dr. Kreutzer served what he understood to be a probationary period, and did not understand what "exempt" meant, nor that he was an at-will employee, nor that his position was anything other than a permanent one.

At Southeast, Dr. Kreutzer provided clinical supervision to a staff of about 20 people, including both medical professionals and unlicensed staff. His duties included participating in evaluations of staff, monitoring the quality of treatment, and attending administrative meetings. However, he also spent a significant portion of his time delivering direct services to patients. Moreover, he admittedly did not have any authority to hire, fire, or discipline any staff members.

About a year after he started working for the City at Southeast, Dr. Kreutzer interviewed for an additional part-time position as medical director of Comprehensive Child Crisis Services, also known as the Comprehensive Child Crisis Clinic (Child Crisis). Dr. Kreutzer was selected for the position, and in November 1995, he began working about 10 hours a week at Child Crisis, plus additional on-call hours for emergencies. Although Dr. Kreutzer interviewed for this position, nothing in the record indicates that he took a posted examination for the position, was placed on or hired from an eligible list, or served a probationary period.

In late 1999, Dr. Kreutzer's hours at Child Crisis were increased to 20 hours per week, in addition to his ongoing responsibilities at Southeast. At about the same time, he was given a pay raise, and promoted to a position in class 2232, senior physician specialist. This position was also classified by the Commission as exempt from the civil service system. Dr. Kreutzer was not selected for this position from an eligible list, and did not serve a

---

[1] While testifying about a similar "non-civil service" box on a different City personnel form, the Commission's executive director, Kate Favetti, explained that this box is checked only on those rare occasions when an appointment is made to a position within the civil service, but the appointment is not made through the normal civil service process because no eligible list is available. (See San Francisco Civil Service Commission Rules (SF CSC Rules), rule 114.22 [defining "Non-Civil Service Appointment" as a temporary appointment made where there is no suitable list].)

probationary period. He again signed an "Appointment Processing" form indicating that his position was "exempt-perm[anent]," but again, he neither understood nor asked what "exempt" meant in that context.

In the spring of 2002, Dr. Kreutzer became the medical director of Mission Family Center, which serves a primarily Spanish-speaking population. He worked there 20 hours a week, while also continuing to work as the medical director at Child Crisis and (until mid-July 2002) at Southeast. His position as a class 2232 senior physician specialist did not change as a result of these changes in his work assignments.

In February and March 2002, Dr. Kreutzer also obtained first temporary, and then permanent, clinical privileges at San Francisco General Hospital (SF General), by virtue of his employment in a part-time position, under the auspices of the University of California, San Francisco (UCSF), as a psychiatrist at SF General. At this time, Dr. Kreutzer also worked occasionally at Westside Community Mental Health Center and Westside Crisis Clinic (Westside).

On September 6, 2002, Dr. Kreutzer received from the City a document entitled "Notice of Release from Exempt Appointment" (release notice). The release notice informed him that he would be "released from [his] exempt appointment in Class 2232 Senior Physician Specialist. Your services are no longer needed." The release notice was accompanied by a separation report stating that Dr. Kreutzer's position was "permanent exempt" and that his release was "non-disciplinary."

Dr. Kreutzer challenged his release through his union, which filed a grievance and arranged for an arbitration. The arbitrator ruled, however, that because Dr. Kreutzer's release was nondisciplinary, he was not entitled to a hearing to challenge the release under the applicable collective bargaining agreement.

Dr. Kreutzer also appealed his release to the Commission, contending that his positions involved significant administrative and supervisory duties, and that he was therefore entitled under the San Francisco Charter to receive the protections of the civil service system. The City's Department of Human Resources and the Commission both informed Dr. Kreutzer that because he had been released from an exempt position, the Commission had no authority to reverse the decision and would not grant a hearing. The Commission also explained to Dr. Kreutzer that it had no jurisdiction to review his release because no restrictions had been placed on his future employment with the City.

After his release from his employment with the City, Dr. Kreutzer increased his hours at SF General and Westside, and also sought other work. During the first half of 2003, Dr. Kreutzer worked from 12 hours a week up to as much as 94 percent of full time as a UCSF physician stationed at SF General. During this time, no restriction or reduction was imposed on Dr. Kreutzer's clinical privileges at SF General. In June 2003, however, UCSF discharged Dr. Kreutzer from the medical staff employed by UCSF at SF General. Subsequent to Dr. Kreutzer's discharge by UCSF in June 2003, SF General revoked his clinical privileges.

After leaving UCSF, Dr. Kreutzer worked simultaneously as a half-time child psychiatrist for Contra Costa County and as the medical director of a private sector residential treatment program called STARS. As of the time of trial, he was still working eight hours a week for STARS; was the medical director of Starlight Adolescent Center in San Jose, where he worked 20 to 30 hours a week; and worked up to four hours a week at the Burt Children's Center in San Francisco. He also served on the clinical faculty at UCSF and maintained a private practice, though he did not have any patients as of the time of trial.

On May 18, 2004, Dr. Kreutzer filed the complaint in this litigation against the City. On May 12, 2006, he filed an amended complaint, which pleaded causes of action for retaliatory discharge and violation of due process. The parties stipulated that the issue of the timeliness of the complaint, including the City's laches defense, would be tried to the court, sitting without a jury, along with Dr. Kreutzer's cause of action for violation of due process. Following the conclusion of the trial, after the trial court announced its findings orally on the record, Dr. Kreutzer voluntarily dismissed the remaining cause of action in his complaint.

On December 1, 2006, the trial court filed a statement of decision and judgment finding in Dr. Kreutzer's favor both as to the timeliness of the complaint[2] and as to the merits, and ordering Dr. Kreutzer reinstated with back pay. The City's timely appeal ensued.[3]

---

[2] The trial court concluded that Dr. Kreutzer's complaint was timely filed under Government Code section 945.6, despite the lapse of time between the denial of Dr. Kreutzer's claim under the Government Tort Claims Act and the filing of the complaint, because the court found that Dr. Kreutzer's attorney never received the claim denial letter. The court did not address the City's laches defense, however. In light of our disposition of this appeal on the merits, we deem it unnecessary to reach this issue.

[3] The trial court later issued an order awarding Dr. Kreutzer his attorney fees, from which the City also timely appealed (the attorney fees appeal). (*Kreutzer v. City and County of San Francisco* (A120530, app. pending).) On June 24, 2008, we granted the City's motion to stay

## II. DISCUSSION

### A. Exemption from Civil Service Protection

As revised in 1994, the City's Charter provides, in section 10.104, that "[t]he following positions shall be exempt from competitive civil service selection, appointment and removal procedures, and the person serving in the position shall serve at the pleasure of the appointing authority: [¶] . . . [¶] . . . physicians and dentists serving in their professional capacity (except those physicians and dentists whose duties are significantly administrative or supervisory)." (S.F. Charter, § 10.104.) In 1988, the Commission determined, under the predecessor to this provision, that the duties of physicians in class 2232 (which included the position Dr. Kreutzer held at the time of his release) were primarily clinical rather than supervisory and administrative, and that class 2232 should therefore be an exempt classification.

In the present case, the trial judge found as a factual matter that Dr. Kreutzer did in fact have significant supervisory and administrative duties, and concluded based on that fact that Dr. Kreutzer was not exempt from the civil service system, and therefore had a right to a hearing under civil service procedures before being removed from his position. The finding that Dr. Kreutzer had significant supervisory and administrative duties is supported by substantial evidence, and under the applicable standard of review, we cannot disturb it. (*Veguez v. Governing Bd. of the Long Beach Unified School Dist.* (2005) 127 Cal.App.4th 406, 414 [25 Cal.Rptr.3d 526].) The trial court's conclusion that Dr. Kreutzer was therefore not exempt from the civil service system, however, is a question of law that we review de novo. (*Sacramento County Alliance of Law Enforcement v. County of Sacramento* (2007) 151 Cal.App.4th 1012, 1017 [60 Cal.Rptr.3d 202] [" '[T]he proper interpretation of civil service rules is subject to de novo review as a pure question of law' under 'the same general rules [of construction and interpretation] that are used for statutes.'. . ."]; see also, e.g., *Searles Valley Minerals Operations, Inc. v. State Bd. of Equalization* (2008) 160 Cal.App.4th 514, 520 [72 Cal.Rptr.3d 857] ["The interpretation of a statute or a regulation presents a question of law and, accordingly, . . . is subject to de novo judicial review."]; *Rex Club v. Workers' Comp. Appeals Bd.* (1997) 53 Cal.App.4th 1465, 1470–1471 [62 Cal.Rptr.2d 393] ["the construction of a statute and its applicability to a given situation are matters of law that are reviewable by the courts"].)

▮ In effect, the trial court ruled that a position classified as exempt by the Commission had been transformed into a nonexempt position by virtue of

---

briefing in the attorney fees appeal pending resolution of the instant appeal on the merits. In light of our disposition herein, we will enter a separate order in the attorney fees appeal dismissing it as moot.

the incumbent's performance of duties that, under the applicable charter provision, are characteristic of a nonexempt position. Longstanding precedent compels us to reject this conclusion as erroneous. It has been the law in California, at least since 1938, that a fundamental principle of the civil service system is that employees do not become entitled to occupy positions in classifications other than the ones to which they were appointed merely by virtue of having been assigned duties that properly belong to a higher classification, and that if the rule were otherwise, "the entire fabric of the civil service system would fail." (*Pinion v. State Personnel Board* (1938) 29 Cal.App.2d 314, 319 [84 P.2d 185].)

■ For that reason, "[a]ttempts by individuals and agencies to circumvent the civil service hiring rules have been repeatedly struck down. [Citations.]" (*Snow v. Board of Administration* (1978) 87 Cal.App.3d 484, 488 [151 Cal.Rptr. 127] (*Snow*); see also, e.g., *Bell v. Duffy* (1980) 111 Cal.App.3d 643, 648–650 [168 Cal.Rptr. 753].) In *Snow*, for example, a state employee who had been awarded compensation for performing the duties of a higher class than the one to which he was assigned contended that the compensation must be taken into account in computing his retirement benefits. The court rejected this claim, noting that the employee had never taken a competitive examination for, or been appointed to, the higher level position, and that "the mere assumption and performance of the duties of a higher classification cannot require that the employee be appointed to it." (*Snow, supra,* 87 Cal.App.3d at p. 489.)

■ Similarly, in *Otto v. Reardon* (1937) 21 Cal.App.2d 260 [69 P.2d 185] (*Otto*), the court rejected a petition for writ of mandamus by an employee of the State of California who contended that her position should be reclassified to a higher one because her duties had changed. In so holding, the court opined that "[i]t would obviously be destructive of the very principles upon which the civil service system is founded to promote [an employee] . . . without an examination as to the qualifications of the candidate . . ." for the higher position. (*Id.* at p. 262.) Instead, as the court noted, the State Civil Service Commission had provided by rule that when the duties of a position are substantially changed, the remedy is to reclassify the position; hold an examination for the reclassified position; and fill it from an eligible list.[4] (21 Cal.App.2d at p. 265.)

---

[4] This is the procedure that Edward Gazzano, the human resources director of the City's Department of Health, testified would apply if an exempt physician in the same class as Dr. Kreutzer sought to have his or her position reclassified based on the contention that its duties were sufficiently administrative and supervisory to warrant nonexempt status under the City's charter. The Commission's rules provide a procedure for reclassification of positions when the responsibilities of the position "are no longer consistent with the existing class . . . ," and for an appeal to the Commission by an employee affected by any classification action. (SF CSC Rules, rule 109.1.3; see *id.*, rule 109.2.1.)

The policy reasons behind the rule that a change in actual duties cannot result in the de facto reclassification of an employee were explained in *Ligon v. State Personnel Bd.* (1981) 123 Cal.App.3d 583 [176 Cal.Rptr. 717] (*Ligon*). In *Ligon*, a state employee contended that she had been assigned, and had performed, "out-of-class" duties, and that her resulting actual experience should have been recognized by the State Personnel Board as qualifying her to take an examination for a higher position, even though the duties of her actual position did not enable her to meet the minimum qualifications. In holding that out-of-class experience could not be relied upon to qualify an employee to take an examination, the court noted that "[p]aramount to a fair, equitable and complete [civil service system] is an advancement and promotion plan based upon compliance with the statutes and applicable regulations." (*Id.* at pp. 590–591.) The court went on to explain that "[t]o permit out-of-class experience to be substituted for the minimum [in class] experience would permit different appointing powers to short-cut the merit system by assigning higher class duties to employees, thus shortening the experience requirements for admission to the promotional examinations. Those who attain out-of-class status could swiftly bypass other candidates who are dutifully performing their tasks according to their job classifications. Unfairness and acrimony could result." (*Id.* at p. 591.)

■ Dr. Kreutzer attempts to distinguish cases such as *Otto, supra,* 21 Cal.App.2d 260, and *Ligon, supra,* 123 Cal.App.3d 583, on two grounds: first, that unlike the employees in those cases, who asserted the right to civil service protection based on *changes* in their assigned duties, Dr. Kreutzer was assigned administrative and supervisory duties from the very start of his employment by the City; and second, that in this case, unlike in *Otto* and *Ligon*, there was a provision in the city charter under which his position should have been classified as nonexempt. We are not persuaded by these arguments.[5] Even taken together, they show only that Dr. Kreutzer's position

---

[5] We also are not persuaded by Dr. Kreutzer's citation of *Haas v. City of Los Angeles* (1942) 21 Cal.2d 393 [132 P.2d 201]. That case involved a city charter provision establishing pensions for all civil service employees of the Los Angeles Fire Department " 'whose duty it is to prevent or extinguish fires . . . under whatever designation . . . [the employee] may be described . . . .' " (*Id.* at p. 394.) The plaintiff was an employee of the Los Angeles Fire Department who was concededly " 'duly and regularly appointed . . . under civil service rules' " (*ibid.*), and who had accumulated enough years of service and contributions to the fire department's pension fund to qualify for a pension. Nonetheless, the city declined to pay him a pension on the ground that he had been classified under the civil service rules as a painter rather than as a firefighter.

The Supreme Court interpreted the charter provision to require that pensions be paid to all civil service employees, regardless of job title, "whose duties have a substantial connection with fire prevention or fire extinguishment . . . ." (*Haas v. City of Los Angeles, supra,* 21 Cal.2d at p. 394.) Noting that the plaintiff had tested and maintained firefighting equipment, and had even helped to put out fires on occasion, the court held that he was entitled to a pension under the language of the charter. (*Id.* at p. 395.) Thus, the *Haas* court's statement that "it is not the

might more properly have been originally classified as nonexempt by the Commission.[6] The remedy for such misclassification, however, is an application to the Commission for reclassification of the position, not a post hoc decision by a court to grant civil service protection to an exempt employee who did not go through the civil service hiring process before being appointed to the position.

The trial judge adopted Dr. Kreutzer's position on this issue based in part on findings that (1) Dr. Kreutzer's appointment process did not differ substantively from the civil service hiring process; and (2) the City did not introduce evidence that any physician in an exempt position had in fact applied for and received reclassification to a nonexempt position. The first of these findings is not supported by substantial evidence, and the second is irrelevant.

The record does reflect that the examination process undergone by Dr. Kreutzer, which involved nothing more than a review of credentials and a series of interviews, is the same process that is utilized by the Commission for its civil service *examination* process when dealing with licensed professionals. However, that does not mean that the overall *hiring* process was the same for Dr. Kreutzer as it is for civil service positions. Under the applicable Commission rules, hiring for a nonexempt position requires a number of procedural steps in addition to an examination. The availability of an examination for the position must be posted; candidates who complete the examination must be placed on a ranked eligible list; the appointee must be selected from among candidates who are within a certain range on the eligible list (normally the top three); and the appointee must serve a probationary period. (S.F. Charter, §§ 16.116, A8.329; SF CSC Rules, rule 110, § 110.2; rule 113, §§ 113.2, 113.6.1; rule 117, §§ 117.1.1, 117.3.) Promotion from one nonexempt position to another is governed by the same

civil service status of an employee which determines his right under the charter" (*id.* at p. 394), read in context, merely meant that the court interpreted the charter's language as granting the right to a pension to all civil service employees with any firefighting-related duty, regardless of their official civil service job titles. This does not in the least undercut or contradict the substantial body of prior or subsequent case law, *discussed in text, holding that a non-civil service position cannot be transformed into a civil service position merely by assigning out-of-class duties to its occupant.*

[6] We note, however, that the Commission has broad discretion in assigning positions to classifications. (See *Otto, supra,* 21 Cal.App.2d at p. 266 ["The board has a sound discretion in determining . . . whether the addition of certain duties requires a reclassification of [a] position. Unless there is a clear abuse of discretion in that regard we may not interfere with the province of the board by means of mandamus or otherwise." (Italics omitted.)].)

process, and also involves serving a probationary period. (SF CSC Rules, rule 110, § 110.3; see *id.,* rule 114, § 114.3 [referring to "promotive probationary employee"].) Dr. Kreutzer introduced no evidence that any of these additional procedures were followed when he was hired and promoted by the City.[7]

As for the finding that no doctors had ever actually had their exempt positions reclassified, we fail to see what relevance this has to the question before this court. There was no evidence that any doctor, including Dr. Kreutzer, had sought reclassification to a nonexempt position and been denied that remedy. Moreover, the uncontroverted evidence was that if a position were reclassified, the incumbent would not necessarily retain it; rather, the position would be posted, and the incumbent would have to go through the civil service hiring process along with anyone else who wished to apply. This may help to explain the dearth of evidence that reclassifications had been sought or granted. More significantly, it underscores why the remedy for misclassification of a position cannot be simply to reclassify the incumbent as nonexempt and entitled to civil service protection, despite the fact that the incumbent was not initially appointed through the civil service process.

Finally, as already noted, Dr. Kreutzer testified he was unaware that the exempt nature of his position meant that his employment could be terminated at any time without cause and without any right to a civil service hearing. It may be that the City would have been better advised to make sure that the nature of Dr. Kreutzer's position was clear to him from the outset. But the fact remains that under the applicable civil service rules, Dr. Kreutzer's position was classified as exempt, and his employment was terminable at will.

Dr. Kreutzer's misunderstanding on that subject cannot constitute grounds for affording him the right to a civil service hearing to challenge his release from a noncivil service position. In *Williams v. Department of Water & Power* (1982) 130 Cal.App.3d 677 [181 Cal.Rptr. 868], the court rejected a city employee's contention that she was entitled to remain in her noncivil service job unless removed for cause, based on her length of service in the position. The court held that the employee's unilateral expectation of continued employment was not reasonable, because "public employment is accepted subject to the statutory provisions regulating it, and [the employee]

---

[7] Dr. Kreutzer testified that he understood that he served a probationary period when he was first appointed to his class 2230 position in 1994, based on the fact that he was not permitted to use any vacation time for the first six months of his employment. He admitted, however, that he did *not* serve a probationary period when he was promoted to the class 2232 position from which he was eventually released.

knew or should have known of her job limitations expressly set forth in the city charter and in the civil service rules. [Citation.]" (*Id.* at pp. 682–683.)

Similarly, in *Shepherd v. Jones* (1982) 136 Cal.App.3d 1049 [186 Cal.Rptr. 708], the court held that a director of two local agencies whose position was governed by a policy stating that he " 'serve[d] at the pleasure' " of the boards of both agencies could be discharged from one of his positions, without a hearing, by the majority of the board of the employing agency. The court rejected the director's argument that "since a majority of the joint boards was needed to terminate him, he had a greater expectation of continued employment" (*id.* at p. 1058), reasoning that "in order to estab-lish . . . a property interest" in continued employment, "an employee must 'have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' [Citation.]" (*id.* at p. 1057). Because the court rejected employee's interpretation of the policy as requiring the votes of both boards in order for him to be discharged from either position, it rejected his contention that he had a right to a hearing before being terminated.

■ In short, neither the fact that Dr. Kreutzer performed significant administrative and supervisory duties, nor the fact that he was unaware that his position with the City was terminable at will, was sufficient to entitle him to a civil service hearing in connection with his release from his employment. Accordingly, Dr. Kreutzer was not denied due process by the City's refusal to grant him such a hearing.

### B.   Property Interest in Privileges at San Francisco General Hospital

The trial court found that Dr. Kreutzer's termination from his employment with the City was the direct cause of his loss of medical privileges at SF General. On appeal, the City contends that this finding is not supported by substantial evidence. We agree.

By his own account, Dr. Kreutzer continued to provide clinical services at SF General for a full year after his discharge by the City in June 2002. Moreover, the director of quality management at SF General testified without contradiction that according to SF General's records, Dr. Kreutzer's clinical privileges were not altered in any way from the time they were granted in the spring of 2002 until June 2003, when his employment through UCSF was terminated.

In Dr. Kreutzer's responsive brief on appeal, the only evidence he cites in support of the trial court's finding is his own declaration, which he filed in opposition to a motion for summary judgment in related *federal* litigation, but which was never introduced into evidence at trial.[8] In that declaration, Dr. Kreutzer admitted that he continued to see adult patients at SF General after his release from his position with the City, but contended that his release precluded him from seeing the adolescent patients whom he had been treating in his capacity as a physician with the City. Thus, this declaration, even if it were in evidence, would not support the trial court's finding that Dr. Kreutzer's privileges at SF General were revoked as a result of his release. Rather, it would support only a finding that as a result of Dr. Kreutzer's release, he could no longer treat particular patients who were receiving treatment at SF General by virtue of their status as patients of one of the City's clinics. This was an inevitable corollary of Dr. Kreutzer's release by the City, however, and thus does not constitute an independent basis for concluding that the release violated Dr. Kreutzer's due process rights.

## C. Due Process Right Arising out of Stigma

In *Board of Regents v. Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701], a nontenured faculty member at a state university sued for violation of his due process rights after the school declined to renew his contract without stating a reason. In rejecting the claim, the United States Supreme Court opined that " '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' [Citations.] In such a case, due process would accord an opportunity to refute the charge before University officials." (*Id.* at p. 573, fn. omitted.)

---

[8] In another declaration, filed in opposition to a motion for summary judgment in a separate lawsuit by Dr. Kreutzer against UCSF, he stated that he lost his privileges at SF General due to his termination from UCSF's Psychiatric Emergency Services department, and did not attribute the loss to his termination by the City. This declaration is included in the record as one of the City's trial exhibits, but it also apparently was never introduced into evidence.

We note in passing here, for the benefit of the parties' counsel, that our review of the record in this case has been somewhat hampered by the City's inclusion in its appendix of *all* of the parties' proposed trial exhibits, without any accompanying indication as to which exhibits were actually admitted in evidence, and under what exhibit number. This information can be determined from the reporter's transcript, but only with considerable effort. The better practice would be to include in the appendix only exhibits that were actually admitted, with their trial exhibit numbers appended, and exhibits that were offered, but refused, as to which an issue is raised on appeal. (See Cal. Rules of Court, rule 8.124(b)(2)(A) ["[a]n appendix *must not* . . . [¶] . . . [c]ontain documents or portions of documents filed in superior court that are unnecessary for proper consideration of the issues" (italics added)]; see also *id.*, rule 8.124(b)(3) ["All exhibits admitted in evidence, refused, or lodged are deemed part of the record, whether or not the appendix contains copies of them."].)

■ In keeping with this holding, our Supreme Court has adopted the rule that even when a public employee occupies "an at-will position, terminable without cause . . . (and hence . . . [has] no due process *property* right to that position), it is well established that 'an at-will [public] employee's *liberty* interests are deprived when his discharge is accompanied by charges "that might seriously damage his standing and associations in his community" or "impose[] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." ' [Citations.] When such a liberty deprivation occurs, a party has a right to a 'name-clearing hearing.' [Citation.]" (*Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 304–305 [127 Cal.Rptr.2d 482, 58 P.3d 339].)[9] In reliance on this line of cases, Dr. Kreutzer's amended complaint in this case included an allegation that his liberty interest in his reputation had been infringed due to the stigma created by his release from his employment with the City.

In its statement of decision, the trial court concluded that Dr. Kreutzer's liberty interest in his reputation had been infringed by his release from employment, even though the City gave no reason for the release, character-ized it as nondisciplinary, and made no public charges of misconduct against Dr. Kreutzer. In support of this conclusion, the trial court relied on evidence that the release was in fact based on undisclosed stigmatizing reasons, including accusations of racism and patient neglect, which Dr. Kreutzer was never given a chance to rebut. The court also criticized the City for interfering with Dr. Kreutzer's efforts to obtain professional references to give to prospective employers,[10] and found that the mere fact that Dr. Kreutzer had been dismissed from his position without references would be perceived in professional circles as stigmatizing even though no reason for the dismissal was given.

On appeal, the City argues that under the applicable case law, Dr. Kreutzer's discharge did not violate his liberty interest because no

---

[9] In *Katzberg v. Regents of University of California, supra,* 29 Cal.4th 300, our Supreme Court held that deprivation of an employee's liberty interest in reputation does not give rise to any right to sue for monetary damages, as opposed to equitable or declaratory relief. We note, also, that such deprivation, standing alone, entitles the employee *only* to a name-clearing hearing, and not to reinstatement, back pay, or other equitable relief such as that awarded to Dr. Kreutzer by the trial court in this case. (See, e.g., *Board of Regents v. Roth, supra,* 408 U.S. at p. 573, fn. 12 ["Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons."]; *Murden v. County of Sacramento* (1984) 160 Cal.App.3d 302, 310 [206 Cal.Rptr. 699] [temporary, at-will employee discharged on basis of alleged sexual harassment was entitled to name-clearing hearing, but postdischarge hearing was adequate, because employee would not have been entitled to retain job even if he refuted charges].)

[10] Dr. Kreutzer's former supervisor, Dr. DeRanieri, declined to give him a reference after his release. However, Dr. Kreutzer was able to obtain professional references from other sources.

stigmatizing charges were publicly disseminated, and Dr. Kreutzer was not precluded from obtaining other employment. We agree.

█ As the United States Supreme Court made clear in *Bishop v. Wood* (1976) 426 U.S. 341 [48 L.Ed.2d 684, 96 S.Ct. 2074], the right to a name-clearing hearing does not arise when the reasons for an employee's discharge are not made public. In *Bishop v. Wood*, a police officer who was an at-will employee was discharged from his employment. He was told privately that his dismissal was based on failing to follow orders, poor attendance at training, causing low morale, and conduct unsuited to an officer. The court held that because this "communication was not made public, it cannot properly form the basis for a claim that [the officer's] interest in his 'good name, reputation, honor, or integrity' was thereby impaired." (*Id.* at p. 348, fn. omitted.) Even if the reasons given for the discharge were false, the court held, "the reasons stated to him in private had no different impact on his reputation than if they had been true," and thus did not "enhance[] . . . [the officer's] claim that his constitutionally protected interest in liberty ha[d] been impaired." (*Id.* at p. 349, fn. omitted.) As the court reasoned, "[a] contrary evaluation of [the officer's] contention would enable every discharged employee to assert a constitutional claim merely by alleging that his former supervisor made a mistake." (*Ibid.*)

█ The record in the present case is devoid of any proof supporting Dr. Kreutzer's claim of stigma. Dr. Kreutzer was released without any reason being given, and the reasons underlying his release were not publicly disclosed until Dr. Kreutzer challenged the decision.[11] As the Ninth Circuit held in *Hayes v. Phoenix-Talent School Dist. No. 4* (9th Cir. 1990) 893 F.2d 235, 236–237 (*Hayes*), even if the dismissal of an at-will government employee is based on stigmatizing charges, this does not implicate a liberty interest if the reasons are not disclosed to the public. (See also, e.g., *Bell v. Duffy, supra,* 111 Cal.App.3d at pp. 650–651.)

Dr. Kreutzer seeks to counter this line of authority by contending that the City's act of releasing him without a reason was in and of itself stigmatizing, because potential employers would assume that there were reasons, and that they reflected adversely on Dr. Kreutzer's character. This argument is undercut by Dr. Kreutzer's own testimony that when one prospective employer was assured by a respected former colleague of Dr. Kreutzer's that the latter's release by the City had not been due to misconduct or incompetence on his

---

[11] We recognize that the rationale underlying the City's decision to release Dr. Kreutzer has come to light in connection with this lawsuit. However, when an employer initially does not disclose its reasons for discharging an employee, but does so later in connection with litigation challenging the discharge, no liberty interest is infringed by the disclosure. (*Bishop v. Wood, supra,* 426 U.S. at pp. 348–349.)

part, the employer was willing to hire him. Similarly, Dr. Kreutzer testified that recruiters who contacted him to assess his interest in out-of-state jobs were initially concerned about the release, but were willing to offer him positions once he had assured them that it did not involve any misconduct.

In any event, Dr. Kreutzer's argument that his liberty interest was infringed by the release because prospective employers would assume that it was due to misconduct was squarely rejected in *Hayes, supra,* 893 F.2d 235. In that case, the dismissed employee submitted an affidavit from a fellow professional, stating that the employee's "early dismissal . . . implied that moral turpitude had been involved." (*Id.* at p. 237.) The court responded that "[a]n inference drawn from dismissal alone . . . is insufficient to implicate a liberty interest." (*Ibid.*)

A similar point was made by the United States Supreme Court in *Board of Regents v. Roth.* In that case, the court noted that the lower federal courts in the case had "assum[ed] 'that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career[,]' [citation] [a]nd . . . that 'the substantial adverse effect non-retention is likely to have upon the career interests of an individual professor' amounts to a limitation on future employment opportunities sufficient to invoke procedural due process guarantees. [Citation.]" (*Board of Regents v. Roth, supra,* 408 U.S. at p. 574, fn. 13, italics omitted.) The court held, however, that "the record contains no support for these assumptions. There is no suggestion of how nonretention might affect the [faculty member's] future employment prospects. Mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.' [Citation.]" (*Ibid.*)

■ Moreover, despite his allegations of stigma, the record reflects that Dr. Kreutzer was able to obtain employment in his field after his release from his job with the City. He was hired by several different employers, and in fact earned more money after his release than he had before. A dismissal that merely "make[s] [an employee] less attractive to a prospective employer," but does not " ' "foreclos[e] his freedom to take advantage of other employment opportunities," ' " does not result in the deprivation of a protected liberty interest. (*Shepherd v. Jones, supra,* 136 Cal.App.3d at p. 1061.) Accordingly, Dr. Kreutzer is not entitled to any relief on this basis.

## III.  DISPOSITION

The judgment is reversed, and the case is remanded with directions to the trial court to enter a new judgment in favor of the City, and to vacate its postjudgment order awarding attorney fees to Dr. Kreutzer. (See *Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1120–1121 [62 Cal.Rptr.3d 59].) The City is awarded its costs on appeal.

Reardon, J., and Sepulveda, J., concurred.

A petition for a rehearing was denied September 15, 2008, and respondent's petition for review by the Supreme Court was denied December 10, 2008, S167293.