Filed 9/30/15  Oxnard Hospitality Enterprises v. City of Los Angeles CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| OXNARD HOSPITALITY ENTERPRISES, INC. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Defendant and Respondent. | B256727 <br><br> (Los Angeles County <br> Super. Ct. No. BC454667) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Debre Katz Weintraub, Judge.  Affirmed.


Lane & Gulino, and John J. Gulino, for Plaintiffs and Appellants.


Michael N. Feuer, City Attorney, Thomas H. Peters, Chief Deputy City Attorney, Ronald S. Whitaker, Assistant City Attorney, and Gerald M. Sato, Deputy City Attorney, for Defendant and Respondent.


_____

Plaintiff and Appellant Oxnard Hospitality Enterprise, Inc.,[1] doing business as "Babes and Beers," filed an action for damages and injunctive relief against Defendant and Respondent City of Los Angeles based on causes of action alleging violations of its constitutional rights of free speech, due process, and equal protection under the federal and state constitutions. Following a ruling on a motion for summary adjudication as to Oxnard's speech causes of action, and an ensuing bench trial on its remaining causes of action, the trial court entered judgment in favor of the City. Oxnard appeals. We affirm.

## FACTS

### Background

In 1977, A.H. Bronson (not a party in the trial court or on appeal) applied to the City for a building permit and certificate of occupancy to add a dance area in a building located on Oxnard Street in the City's Tarzana neighborhood, in an area zoned for "M1" and "CM" uses, meaning "limited industrial" use and "commercial manufacturing" use. At that time, the building was already being used as a "beer café." In May 1978, the City issued a certificate of occupancy to Bronson; the certificate stated that the "occupancy designation" for the property was a beer café with a dance area.[2]

---

[1]     Hereafter Oxnard. Our references to Oxnard include plaintiff and appellant Elias Laty, Oxnard's sole shareholder. We hereafter refer to Laty only as needed to establish context for the opinion.

[2]     At trial, Oxnard called Frank Lara, a principal inspector in the City's Department of Building and Safety. During his testimony, Lara explained that there is a difference between an "occupancy designation" for a property and the "zoning designation" for a property. For example, Bronson's building on Oxnard Street had an "occupancy designation" of B-2, meaning it had been approved for occupancy as "a small cafe, less than 50 people." As Lara explained: "The certificate of occupancy . . . although it designates the use – it's more related to the occupancy. And occupancy is concerned with how many people are in a building. Because the reason for different occupancies are different occupancies require different type of construction. So the reality is that the certificate of occupancy is intended to approve the construction or the structure for that use rather than to try to control the use itself."

2

At the time of Oxnard's current case, the City had not located "any" record of a conditional use permit ever having been issued for the Oxnard Street building. "[S]ometime in 1977," the City enacted a conditional use permit ordinance governing the service of alcohol at all properties in the City. Under the City's zoning laws, a particular use at a property that preceded the adoption of a conditional use ordinance applicable to the property would be deemed to have "approved status," which means that the property owner would not be required to go through the conditional use process to continue the use "because [it] pre-existed the ordinance." This is commonly characterized as being a "grandfather right."

Sometime around 1996, Charles Parnes purchased the Oxnard Street building.[3] At the time Parnes acquired the building, it was being operated as what he described as a "bikini bar." Sometime around 1998 or 1999, Parnes leased the Oxnard Street building to Dino's Victory Roadhouse, Inc. doing business as "The Frisky Kitty." As best as can be ascertained from the record, The Frisky Kitty apparently operated for some time as a "bikini bar," but then changed its style of business. By the early 2000s, The Frisky Kitty's bikini-clad alcohol servers became nude dancers who did not serve alcohol. In short, The Frisky Kitty became a strip club, without any alcohol. There is evidence in the record showing that Dino's "surrendered" its alcohol license back to the California Department of Alcoholic Beverage Control (ABC) in early 2001 "in order to operate as a full nude club."

***The Frisky Kitty Case***

In 2006, the City initiated a civil action for injunctive relief against Dino's, as the operator of The Frisky Kitty, and against Parnes, as the owner/landlord of the Property. (L.A. Sup. Ct., No. BC353242.) The City's 2006 action alleged various causes of action which basically claimed that The Frisky Kitty was a nuisance in that it was operating as an "adult cabaret" as defined by the Los Angeles Municipal Code (LAMC), and that the operation of such a business at the Property's location violated the LAMC's zoning laws,

---

**3**      Our references to Parnes include any relevant living trust as to which he acted as trustee, or any other related entity.

3

as well as an "Order to Comply" issued by the City's Department of Building and Safety. The alleged zoning violation with The Frisky Kitty was that the LAMC does not permit adult cabarets within 500 feet of a residential or "R" zone under the City's zoning laws, and The Frisky Kitty was allegedly located less than 500 feet from its nearest residential neighbor. Dino's defense against the City's 2006 action consisted largely of a legal argument that the City had used an incorrect measuring methodology to fix the 500 feet boundary line around The Frisky Kitty. Based on the record, there does not appear to have been any issues related to the serving of alcohol involved in the City's 2006 action because, as already noted, Dino's had surrendered its alcohol license years before.

At the conclusion of a bench trial in June 2007, the Los Angeles Superior Court (LASC) allegedly entered a judgment with a permanent injunction directing Dino's not to operate as an "adult cabaret" with nude dancers, but allowing it to operate as a "bikini bar." We deliberately use the word "allegedly" here; the record before us on Oxnard's current appeal does not include a copy of the LASC's 2007 judgment in The Frisky Kitty case, and, thus, we do not know the exact language of the judgment. A reporter's transcript from part of the LASC's trial in 2007, which is included in the record, shows that it was understood at the time by the City's and by Dino's lawyers that dancers at The Frisky Kitty would have to "keep their tops and bottoms on." During the course of an exchange, the City's lawyer told the trial court that it was not the City's position that The Frisky Kitty had to close, only that it had to operate as a bikini bar, not as a nude adult cabaret.[4] The statements of the City's lawyer, of course, were made in the context of a

---

[4]     On our own motion, we take judicial notice that our court eventually affirmed the LASC's 2007 judgment insofar as its permanent injunction provisions were concerned. (See *People ex re. City of Los Angeles v. Dino's Victory Roadhouse, Inc.* (Dec. 19, 2008, B202083) [nonpub. opn.].) In our opinion, we ruled that the City had properly measured the 500 boundary line around adult cabarets by overlaying a 500 foot radius with the cabaret at the center. Rather than, as Dino's argued, a 500 foot line along the walking path from the front door of the cabaret to the front door of the nearest residential property.

4

court case that had not actually placed at issue any question concerning the operation of a bikini bar serving alcohol at the Property, only the operation of an adult cabaret.

Regardless of the express provisions included in the LASC's 2007 judgment for a permanent injunction, it is undisputed fact that, at some point in time around the LASC's injunctive orders, Dino's decided it no longer wanted to operate The Frisky Kitty. There is evidence in the record which shows that Dino's never resumed serving alcohol, with or without bikini-clad employees, at any time after the LASC's 2007 judgment. As noted, Dino's surrendered its ABC license in 2001.

### Oxnard

Toward the end of 2007, a "consultant in the adult entertainment industry," Majid Ahmadi, began working with Elias Laty, Oxnard's founding shareholder (*ante*), and with Charles Parnes, the landlord of the Property where The Fisky Kitty previously operated (*ante*), with an eye toward re-opening a bikini bar at the Property.[5] During his trial testimony in the current case, Laty testified that he met with Parnes during the preliminary efforts to get Oxnard's new business started, and that Parnes told Laty the Property could be operated as a bikini bar under the terms of court rulings in the earlier litigation involving The Frisky Kitty. According to Laty's testimony: Parnes showed Laty "[t]he transcript of the judgment against [The] Frisky Kitty." Ahmadi thereafter assisted Oxnard in applying for and obtaining a Police Commission Permit, and a liquor license from the ABC. In the course of these efforts, Ahmadi and Laty met with a City employee, Richard Kussman, at the "Metro Zoning" counter in downtown, and received a document entitled "Zoning and Use Clearance for Police Permit." The record suggests that Kussman worked for the City's Department of Building and Safety, not the City's Department of Planning. The "zoning clearance" document indicated that the "business shown on the face of the document," namely, a "beer café," was a "permitted use" for the Property. Oxnard obtained a Certificate of Occupancy from the City's Department of

---

[5]     Laty's educational and work experience was as an accountant. He knew about The Frisky Kitty business because he had been its accountant when it was operating.

Building and Safety  Around July 1, 2008, Oxnard opened its doors for business as a bikini bar.

### The Events Surrounding the City's Order for a New CUP

On February 5, 2009, an assailant critically injured one of Oxnard's workers by luring her outside the premises, dousing her with gasoline and setting her on fire.  On a date not explicitly shown by the record on appeal, Los Angeles City Councilperson Dennis Zine publicly disseminated statements calling the Property a "hotbed" of criminal activity, noting that he previously caused "the business" at the Property to be shut down (implicitly referring to the previous business, The Frisky Kitty), and that he was "shocked" to find that "it" had re-opened.  Zine vowed that, if "it" had re-opened legally, then there was going to be "hell to pay."[6]

On February 6, 2009, the City's Department of Building and Safety issued an "Order to Comply" to Oxnard with an "effective date" of February 11, 2009 and with a "compliance date" of February 26, 2009.  The Order to Comply stated that Oxnard had failed to obtain "the required conditional use permit [(CUP)] . . . to allow the sale of alcohol after the premises had discontinued the sale of alcohol . . . for a period of more than a year."[7]  The Order to Comply was addressed Oxnard, but included a site location reference which identified the violation as occurring at "Babes & Beer (Frisky Kitty)." The Order to Comply ordered Oxnard to discontinue the sale of alcoholic beverages, or to obtain a CUP allowing such sales.  It advised Oxnard that a failure to comply within 15 days from the compliance date would result in the imposition of a non-compliance fee. Further, the Order to Comply advised Oxnard that that City had established "an appeal

---

[6]     Oxnard asserts in its opening brief that Councilperson Zine held a press conference in front of Oxnard's business, but there are no citations to the record directing us to any evidence supporting Oxnard's assertion.  There is a collection of press stories in the form of internet retrievals included in the record on appeal, and we have summarized the gist of Councilperson Zines's comments as taken from those materials.

[7]     A "Comment[]" on the face of the Order to Comply stated:  "Business abandoned alcohol service for more than six years while operating as fully nude adult caberet."

procedure . . . to hear and determine err[ors] or abuse of discretion or requests for slight modification of the requirements contained in [the Order to Comply]," and that, if Oxnard did not file such an appeal within 15 days of the compliance date, "the determination of the [Department of Building and Safety] to impose and collect a non-compliance fee [would become] final."[8]

Oxnard filed an appeal from the City's decision to require Oxnard to obtain a CUP. During an ensuing administrative hearing in September 2009 before a City "zoning administrator" in the City's Department of Planning, a number of witnesses testified, including Elias Laty, Oxnard's owner, "Max" Ahmadi, and Charles Parnes, the owner of the Property, along with members of the public.

The zoning administrator issued a written determination that upheld the City's decision to issue the Order to Comply and to require Oxnard to obtain a CUP. The determination was made pursuant to LAMC section 12.24-Q, which reads:

> "Discontinuance of Use. If a conditional use is abandoned, or is discontinued for a continuous period of one year, it may not be re-established unless authorized in accordance with the procedure prescribed in the [LAMC] for the establishment of a conditional use."

Further, the determination included findings and conclusions as follows:

> "The record shows that the [prior] owner/operator of business at the subject location elected to maintain operation of an adult cabaret (nude entertainment venue) and voluntarily surrendered their ABC license on February 19, 2001. In so doing, the [prior] owner/operator discontinued the sale of alcohol for more than a one-

---

[8]    In its opening brief on appeal, Oxnard asserts that the City was "continuing its effort to put The Frisky Kitty out of business and was now focusing its attention on [Oxnard] for no reason other than 'guilt by association.'" Oxnard asserts that it negotiated its own and separate lease with the landlord, Parnes, and had established a wholly new business unrelated to The Frisky Kitty.

year time period, thus losing any non-conforming rights that may have been available to them under the 1998 Certificate of Occupancy.

"At the time the [current] owner/operators reactivated the ABC license on August 16, 2007, the operation required a conditional use permit pursuant to [LAMC] Section 12.24-W, and [LAMC] Section 12.24-Q . . . in order to legally sell alcohol within the City of Los Angeles.

As noted by the Department of Building and Safety in their March, 2009 determination, a certificate of occupancy, issued by [the Department of Building and Safety] establishes the use of the building, however the right to dispense alcohol is a separate process determined by the Department of City Planning, in the form of a Conditional Use Permit."

Finally, the determination advised Oxnard of its further appeal rights as follows:

"The Zoning Administrator's determination in this matter will become effective after NOVEMBER 12, 2009, unless an appeal therefrom is filed with the City Planning Department. It is strongly advised that appeals be filed early during the appeal period and in person so that imperfections/incompleteness may be corrected before the appeal period expires. Any appeal must be filed on the prescribed forms, accompanied by the required fee, a copy of the Zoning Administrator's action, and received and receipted at a public office of the Department of City Planning on or before the above day or the appeal will not be accepted. Forms are available on line at [website address]. Public offices are located at: [street addresses listed].

8

"If you seek judicial review of any decision of the City pursuant to . . . Code of Civil Procedure Section 1094.5, the petition for writ of mandate pursuant to that section must be filed no later than the 90th day following the date on which the City's decision became final pursuant to . . . Code of Civil Procedure Section 1094.6. There may be other time limits which also affect your ability to seek judicial review."

Meanwhile, even before the zoning administrator issued her final decision, Oxnard closed its doors in September 2009.[9] At trial, Laty testified that the negative publicity about the incident with the attack on Oxnard's employee caused consumers to stay away from its business. As stated by Laty: "Without the incident — the incident has ruined my business."

*The Litigation*

In February 2011, more than one year after its closed its business, Oxnard filed a complaint for damages and injunctive relief against the City. Oxnard's complaint alleged six causes of action, listed respectively, as follows: a violation of freedom of speech under the federal constitution pursuant to 42 U.S.C. Section 1983; a violation of due process under the federal constitution pursuant to 42 U.S.C. Section 1983; a violation of equal protection under the federal constitution pursuant to 42 U.S.C. Section 1983; a violation of freedom of speech under the state constitution; a violation of due process under the state constitution; and a violation of equal protection under the state constitution.

The record before us on appeal shows a notation in a minute order that the trial court "granted summary adjudication in favor of [the City] as to the first cause of action for violation of freedom of speech [under the federal constitution] and the fourth cause of

---

[9] In its opening brief on appeal, Oxnard asserts the City "effectively put [Oxnard] out of business, effectively taking [its] business enterprise and all of [its] investment for no lawful reason . . . ."

9

action for violation of freedom of speech under the California constitution . . . ." Oxnard elected to proceed by an appellant's appendix on appeal. There are no materials in Oxnard's appendix connected with a motion for summary adjudication of issues, or the court's ruling on such a motion. The reference here to a notation in a minute order is taken from a minute order issued at the time of trial, in which the trial court explained why it only addressed Oxnard's second, third, fifth, and sixth causes of action at trial.

In January 2014, Oxnard tried the remainder of its case to the trial court. The trial court entered judgment in favor of the City, including an award of costs ($2141.85) against Oxnard and its sole shareholder, Elias Laty, payable jointly and severally.

Oxnard and Laty filed a timely notice of appeal.

## DISCUSSION

## I. Oxnard's Argument that There was a Government "Taking" of its Property is Waived

We summarily reject Oxnard's argument that the City "engaged in an unlawful taking of [Oxnard]'s property" under the state and federal constitutions when it required the company to obtain a CUP. From what we are able to understand from its brief, Oxnard is contending the City engaged in a "regulatory taking" of property for which it should receive just compensation. (See, e.g., *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 260.) This argument is irrelevant to Oxnard's current appeal because Oxnard did not allege a cause of action in its complaint for a taking of its property. Indeed, the word "taking" is not to be found at any place in Oxnard's complaint. The issues to be decided in a case are framed by the pleadings, and Oxnard simply did not put a taking claim at issue.

## II. The Government Tort Claims Act

We also summarily reject Oxnard's various arguments concerning the requirement for filing a damages claim under the Government Tort Claims Act (see Gov. Code, § 900 et seq.) as to its causes of action for damages based on alleged violations of the state constitution. As one example, Oxnard argues that its "causes of action based on state law have not yet accrued against the City . . . ."

10

We agree with the City that it is an "idle debate" to look at any issue associated with the Government Tort Claim Act because California simply does not recognize a common law cause of action for damages against a government entity based on violations of the state constitution, nor is there a state statutorily created cause of action for damages analogous to 42 U.S.C. section 1983 for alleged violations of the state constitution. (See generally, *Katzberg v. Regents of the University of California* (2002) 29 Cal.4th 300, 307-329.) Accordingly, the judgment in favor of the City is not subject to reversal as to Oxnard's fourth, fifth and sixth causes of action based on alleged violations of the state constitution insofar as Oxnard seeks damages for the alleged state constitutional wrong.

We will not address Oxnard's claims for injunctive relief under the state constitution because the evidence in the trial record shows without any dispute that Oxnard closed Babes and Beers' long before Oxnard filed its current lawsuit. As a result, there never was any meaningful form of injunctive relief to be fashioned in Oxnard's case based on alleged violations of the state constitution.

III.    **Oxnard Waived its Argument That its Constitutional Right to Freedom of Speech was Violated**

Oxnard's opening brief contains no argument challenging the trial court's ruling on the City's motion for summary adjudication as to Oxnard's first cause of action for violation of its federal constitutional right to freedom of speech. As a result, the argument is waived. (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074 [when appellant asserts a point but fails to support it with reasoned argument and authority, an appellate court may considered it waived.].) [10]

---

[10]    The table of contents in Oxnard's reply brief indicates there would be a freedom of speech argument presented in the reply brief, but the actual text of the brief contains no such argument. In any event, it is well-settled that points raised for the first time in a reply brief will not be considered under good cause is shown. (See, e.g., *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 65.)

11

Further, as noted above, Oxnard's appendix does not contain any papers associated with the City's motion or the trial court's order. Appellant bears the burden of overcoming the presumption that the judgment is correct by presenting an adequate appellate record that demonstrates error. Failure to provide an adequate record on an issue mandates that we find against appellant. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.) For this reason also, we consider any claim of error to have been waived.

**IV.    There Was No Violation of Oxnard's Federal Constitutional Right to Substantive Due Process**

As we understand Oxnard's argument on appeal, it contends that the trial court erred in entering judgment in favor of the City because the record supports only one conclusion -- that the City violated Oxnard's right to substantive due process under the federal constitution by requiring it to obtain a CUP. Oxnard's theory is that certain injunctive orders issued by the LASC in 2007 in the underlying case involving The Frisky Kitty authorized a bikini bar to be operated at the Property, whomsoever the operator of the bikini bar may be, and whenever those operations commenced. Oxnard basically argues that the LASC's 2007 injunctive orders included a judicial declaration of a land use right to operate a bikini bar with alcohol service at the Property which stayed with the Property, without respect to any change in circumstances in ownership or timing. It might also be said that Oxnard contends it had some form of "grandfathered" zoning right to operate a bikini bar with alcohol service. We find no error.

Oxnard alleged a cause of action for damages and injunctive relief against the City under 42 U.S.C. Section 1983, based on a claim that the City violated the company's constitutionally protected right to "due process." We have assumed for purposes of discussion that the pleading embodied only a claim that the manner in which the City addressed the CUP issue violated Oxnard's *right to substantive due process*. We take this path, in part, based on Oxnard's arguments in its briefs on appeal. With this framework in place, we address the overriding issue whether the trial court erred in deciding Oxnard's substantive due process claim against Oxnard.

12

To establish an alleged violation of substantive due process, a plaintiff must prove an injury caused by "government power . . . being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests." (See *Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 709-710, internal citations and quotations omitted.) Thus, "[t]ypical land use disputes involving alleged procedural irregularities, violations of state law, and unfairness ordinarily do not implicate substantive due process. . . . Even where [government] officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a . . . deprivation [of the constitutional right to substantive due process]. . . . The doctrine of substantive due process 'does not protect individuals from all [governmental] actions that infringe liberty or injury property in violation of some law." (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 856, internal citations and quotations omitted.)

The trial record discloses no substantial evidence supporting a judgment on Oxnard's claim that its right to substantive due process was violated by the City's issuance the Order to Comply – i.e., by requiring the business to obtain a CUP to sell alcoholic beverages. Oxnard contends that requiring it to obtain a CUP, the City contravened the judgment in the earlier case involving The Frisky Kitty, and reneged on a representation by a City employee, and otherwise wrongfully revoked a grandfathered right to sell alcohol at the Property without the need for a CUP, all of which rendered the City's CUP order erroneous. Even assuming that the City's order to require a CUP was issued in error, it did not amount to an exercise of government power being used for purposes of oppression, an abuse of government power that shocks the conscience, or an action that was legally irrational in that it was not sufficiently keyed to any legitimate state interests. LAMC, Article 2, section 12.24-Q states that a CUP is required when a conditional use has been discontinued for a period of one year. Here, it is undisputed that the service of alcohol is, since 1977, a conditional use, and that such a use was

13

discontinued for far longer than one year when Oxnard started its efforts to open its bikini bar.

This brings us to the fatal flaw in Oxnard's case — that they did not and could not prove a deprivation of any cognizable protected interest. The adjudication of factual and legal issues by the zoning administrator became final when Oxnard failed to seek further review, including a petition for writ of administrative mandate seeking reversal of the zoning administrator's decision. The zoning administrator determined that the LAMC required Oxnard to obtain a CUP to serve alcoholic beverages because service of alcohol had been discontinued more than one year earlier. Unreviewed final administrative decisions are entitled to res judicata and collateral estoppel effect in actions under 42 U.S.C. §1983. (*Briggs v. City of Rolling Hills Estates* (1995) 40 Cal.App.4th 637, 645-650; *Jamieson v. City Council of the City of Carpinteria* (2012) 204 Cal.App.4th 755, 760-761.) The City's decision to require Oxnard to obtain a CUP did not have the result of depriving Oxnard of any cognizable right or interest because it had been determined — well before Oxnard filed its court action — that Oxnard had no right or interest to serve alcohol without a CUP. Moreover, it is factually undisputed that alcohol service at the Property had ceased for more than one year prior to Oxnard's attempts to open a bikini bar at the Property, so it can be said without dispute that a CUP was required even if the zoning administrator's decision is ignored.

To avoid this result, Oxnard argues that it had a right to operate a bikini bar and serve alcohol, without a new CUP, because the 2007 injunctive orders issued by the LASC declared that it that it had such a right. Specifically, Oxnard argues the LASC's 2007 injunctive orders adjudicated "the right of occupants of the Property to operate as a 'bikini bar,'" that the LASC's 2007 decision should have been given res judicata effect by the City before it required Oxnard to obtain a CUP in 2009. Further, that the City effectively "overruled" the LASC's 2007 decision by requiring Oxnard to obtain a CUP in 2009. We are not persuaded for several reasons.

14

First, the only fact firmly established by the record about the LASC's 2007 decision in The Frisky Kitty case is that the LASC issued an injunction against Dino's from operating a nude adult cabaret. We see nothing in the record to support a conclusion that in 2007, the LASC did, or even could have, issued an order giving any and every "occupant" of the Property, at any and for all time, a right to operate a bikini bar with alcohol service at the Property.

Second, we reject Oxnard's theory that it had a right to operate a bikini bar that serves alcohol without the need for obtaining a CUP because a City employee in the City's Department of Building and Safety, Richard Kussman, represented to Oxnard that it had such a right when he signed off on the "Zoning and Use Clearance for Police Permit". Assuming the evidence established that Kussman made such a representation to Oxnard, its arguments do not show that Kussman could bind the City to a position that contravened the LAMC's requirement that a new CUP must be obtained when a prior approved use expired by non-use.

Third, we do not accept Oxnard's argument that it possessed an immutable, grandfathered right at all relevant times to operate a business that served alcohol at the Property. The evidence in the record, even when construed in Oxnard's favor in contravention of the usual standard on appeal, shows that Bronson had a right to continue serving alcohol at the property after 1977 when the City adopted its conditional use ordinance for alcohol because he was serving alcohol before the ordinance was adopted. Assuming that Bronson could have and did in fact convey his right to serve alcohol to Parnes, and that Parnes could have and did in fact convey his right to serve alcohol to Dino's, the City did not act oppressively when it deemed the right to serve alcohol had been terminated or was extinguished when Dino's stopped serving alcohol for a number of years. (See LAMC § 12.24-Q.) The City then issued an Order to Comply, and provided Oxnard an administrative hearing on the issue. Oxnard did not prevail at that administrative hearing, and did not challenge the administrative decision. Accordingly, its attempt to re-assert a right to serve alcohol without obtaining a CUP was foreclosed in its current court action.

15

Finally, we find misplaced Oxnard's argument that it was not required to pursue a petition for writ of administrative mandate as a pre-requisite to filing, and winning, a cause of action under 42 U.S.C. Section 1983. Oxnard appears to miss the legal significance of its failure to pursue administrative remedies. Neither the City, in defending Oxnard's court case, nor the trial court, in deciding the case in favor of the City, took the position that there was a "failure to exhaust administrative remedies" bar that operated to preclude Oxnard from bringing its court case. Rather, what occurred in Oxnard's case is that the City argued, and the trial court found, there was a collateral estoppel effect as a result of the zoning administrator's findings and decision in October 2009, which Oxnard left undisturbed when it walked away from any further administrative proceedings. In short, there was a plain and unchallenged administrative determination that Oxnard needed to obtain a CUP to serve alcohol well before Oxnard filed a court case alleging that it did not need a CUP to serve alcohol. We need not and do not speculate about what may have occurred had Oxnard promptly filed a court action to enjoin the City from enforcing its Order to Comply, prior to the administrative proceedings. What we can say is that by pursuing an administrative appeal and seeking an administrative decision from the zoning administrator, and then letting that decision stand, the administrative decision thereafter had collateral estoppel consequences in Oxnard's subsequent court action.

## V.      Oxnard Waived its Argument That There Was a Violation of its Federal Constitutional Right to Equal Protection Under the Law

Oxnard's opening brief on appeal offers no meaningful argument as to why judgment in favor of the City on the business's claim for violation of its constitutional right to equal protection is incorrect. Accordingly, we deem the claim to be abandoned. (*Salas v. Department of Transportation, supra,* 198 Cal.App.4th at p. 1074 [when appellant asserts a point but fails to support it with reasoned argument and authority, an appellate court may considered it waived.].)

16

**DISPOSITION**

The judgment is affirmed.  Respondent is awarded costs on appeal.


BIGELOW, P.J.

We concur:


RUBIN, J.


GRIMES, J.